UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL DAVIS-GUIDER,

                    Plaintiff,                    Civil Case No.: 1:17-cv-01290
                                                              (FJS/DJS)

        -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and JOEL ABELOVE,
Individually,

                    Defendants.

**MEMORANDUM OF LAW**

 

**BAILEY, JOHNSON & PECK, P.C.**
Attorneys for Defendants Rensselaer County,
Michael Sikirica, and Joel Abelove
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, New York 12205

## <u>TABLE OF CONTENTS</u>

STATEMENT OF FACTS ............................................................................................. 1

ARGUMENT ............................................................................................................... 1

**POINT I:**   DAVIS'S FALSE ARREST, MALICIOUS PROSECUTION,
AND FAIR TRIAL CLAIMS—AS WELL AS HIS STATE
LAW MALICIOUS PROSECUTION CLAIM—FAIL AS A
MATTER OF LAW, AND SHOULD BE DISMISSED. ...................... 2

A. Relevant law ............................................................................. 2

   i.  False arrest .......................................................................... 2

   ii.  Malicious prosecution ......................................................... 3

   iii.  Denial of right to fair trial ..................................................... 4

B.  Davis's arrest and prosecution were supported by
probable cause ........................................................................ 5

C.  Dr. Sikirica was not the proximate cause of Davis's arrest
and prosecution ....................................................................... 11

D.  Sikirica and Abelove did not act with malice ........................... 12

E.  Abelove was not personally involved in any alleged
constitutional violations ........................................................... 12

**POINT II:**   DR. SIKIRICA AND ABELOVE ARE ENTITLED TO
ABSOLUTE IMMUNITY ................................................................ 14

   i.  Dr. Sikirica ........................................................................ 14

   ii.  Abelove ............................................................................. 15

**POINT III:**   DR. SIKIRICA AND ABELOVE ARE ENTITLED TO
QUALIFIED IMMUNITY ................................................................ 17

   i.  Dr. Sikirica ........................................................................ 17

   ii.  Abelove ............................................................................. 19

i

**POINT IV:** DAVIS'S CONSIPIRACY CLAIM PURSUANT TO 42 U.S.C.
§ 1983 FAILS AS A MATTER OF LAW, AND SHOULD BE
DISMISSED ................................................................................. 19

**POINT V:** DAVIS'S FAILURE TO INTERVENE CLAIM BROUGHT
PURSUANT TO SECTION 1983 FAILS AS A MATTER OF
LAW AS AGAINST ABELOVE; DISMISSAL IS
WARRANTED .............................................................................. 21

**POINT VI:** DAVIS HAS FAILED TO SUFFICIENTLY PROVE A 42 U.S.C.
§ 1983 CLAIM AGAINST COUNTY OF RENSSELAER, AND
ACCORDINGLY, HIS SEVENTH CAUSE OF ACTION SHOULD
BE DISMISSED ........................................................................... 22

**POINT VII:** DAVIS HAS FAILED TO DEMONSTRATE AN ENTITLEMENT
TO PUNITIVE DAMAGES AS AGAINST DR. SIKIRICA AND
ABELOVE ................................................................................... 23

CONCLUSION .................................................................................... 24

## STATEMENT OF MATERIAL FACTS

Defendants Rensselaer County ("County"), Michael Sikirica ("Dr. Sikirica"), and Joel Abelove ("Abelove") respectfully direct the Court to their separately submitted statement of material facts, with exhibits, together with the affidavit of William C. Firth, Esq., for a complete recitation of the relevant facts herein.

Unless otherwise noted, all exhibit citations refer to those attached to the statement of material facts.

## ARGUMENT

A Court may grant summary judgment when the moving party carries its burden of showing an absence of a genuine issue of material fact. *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Further, a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. Thus, a genuine issue of material fact exists "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson*, 477 U.S. at 248).

When determining whether a genuine issue of material fact exists, all factual inferences must be drawn and all ambiguities resolved in favor of the nonmoving party. *See*, e.g., *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "[C]onclusory allegations, conjecture, and speculation…are insufficient to create a genuine issue of fact," however. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400

1

(2d Cir. 1998) (citation omitted); *accord Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

Once the moving party has met its burden, the burden shifts to the nonmoving party who must then present specific facts showing that there is a genuine issue of material fact warranting a trial. *Fed. R. Civ. P. 56(c)*; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "A defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to [his] case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247-48); accord *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Chase Manhattan Bank v. Am. Nat'l Bank & Trust Co. of Chi.*, 93 F.3d 1064, 1072 (2d Cir. 1996). A failure by the nonmovant to produce such evidence renders a claim ripe for summary judgment. *Fed. R. Civ. P. 56(c)*.

### POINT I

**DAVIS'S FALSE ARREST, MALICIOUS PROSECUTION, AND FAIR TRIAL CLAIMS—AS WELL AS HIS STATE LAW MALICIOUS PROSECUTION CLAIM—FAIL AS A MATTER OF LAW, AND SHOULD BE DISMISSED.**

**A.**     *Relevant law*

    *i.*     *False arrest*

"A claim for false arrest, detention or imprisonment is evaluated pursuant to the Fourth Amendment right to be free from unreasonable searches and seizures. The elements of such a claim are that (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was aware of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Waldron v. Milana¸*

2012 U.S. Dist. LEXIS 128279, at *17-18 (N.D.N.Y. Sep. 10, 2012) (internal citations and quotations omitted).

Additionally, "the Second Circuit in <u>Roesch v. Otarola</u> extended the holding of the <u>Singleton</u> decision to also require a favorable termination in the underlying criminal action in order to state a § 1983 claim for false arrest and false imprisonment." *Pawlicki v. City of Ithaca*, 1996 U.S. Dist. LEXIS 18090, at *4 (N.D.N.Y. Dec. 5, 1996) (*citing Roesch v. Otarola*, 980 F.2d 850, 854 (2d Cir. 1992); *see also, Miles v. City of Hartford*, 445 Fed. Appx. 379, 383 (2d Cir. 2011); *Johnson v. Bax*, 63 F.3d 154, 159 (2d Cir. 1995); *Smith v. County of Saratoga*, 1996 U.S. Dist. LEXIS 16319, at *14-15 (N.D.N.Y. Oct. 29, 1996); *Johnson-Schmitt v. Robinson*, 990 F. Supp. 2d 331, 345 (W.D.N.Y. 2013).

### ii. Malicious prosecution

To succeed on a malicious-prosecution claim under New York state law, a plaintiff must show: "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (internal citations and quotations omitted); *see also DiBlasio v. City of New York*, 102 F.3d 654, 657 (2d Cir. 1996).

In addition to the four elements above, in order to prevail on a malicious prosecution claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that there was "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth

Amendment rights." *Rohman*, 215 F.3d at 215 (citing *Murphy v. Lynn, 118 F.3d 938, 944-46 (2d Cir. 1997))*.

With regard to the second element set forth above, the existence of probable cause is an absolute bar to a claim for malicious prosecution under either federal or state law.  *Savino*, 331 F.3d at 72. If an arrest is supported by probable cause with regard to one charged offense, it is unnecessary to determine whether probable cause exists to support all other offenses charged. *Jaegly*, 439 F.3d at 154; *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 335 (E.D.N.Y. 2006).

In order to sufficiently demonstrate the third element, plaintiff must show that the defendant "commence[d] a criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502-03 (1978) (internal quotations omitted); *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003) (internal citation omitted).

In addition to the above elements, a plaintiff must demonstrate that there was "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman*, 215 F.3d at 215 (internal citation omitted).

### iii.      Denial of right to fair trial

"A section 1983 claim for the denial of a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction. The claim finds its roots in the Sixth Amendment, as well as the due process clauses of the Fifth and Fourteenth Amendments." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 445 (E.D.N.Y. 2015).

4

In order to successfully prevail on a violation of the right to a fair trial, a plaintiff must establish that: "(1) an investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of New York*, 2012 WL 2331171, at *2 (2d Cir. June 20, 2012) (internal citations omitted).

### B. *Davis's arrest and prosecution were supported by probable cause.*

Davis asserts in his first cause of action that he was subjected to false arrest by TPD defendants and Dr. Sikirica. *Exhibit "B,"* ¶¶ 65-66. Davis's claim against Sikirica is based only upon: (1) the omission in the autopsy report of the EMTs' and hospital staff's administration of CPR for a prolonged period of time; and (2), classifying the manner of V.D.'s death as a homicide. *Id*. at ¶¶ 36-37. It is noteworthy that Davis does not allege that Dr. Sikirica falsified his report, committed perjury, or otherwise fabricated the extent and nature of V.D.'s injuries. *Exhibit "B,"* generally.

Davis claims that the above actions on the part of Dr. Sikirica also form the basis for his malicious-prosecution claim. *Id*. And in terms of Abelove, Davis asserts that he was maliciously prosecuted by him by virtue of his active involvement in the investigation, and Abelove's reliance upon Dr. Sikirica's unsupported autopsy report, which created a "fabricated cover for Mr. Davis-Guider's arrest and ensuing malicious prosecution." *Id*. at ¶¶ 31, 41.

Probable cause for an arrest is a complete defense to a claim of false arrest or unlawful search and seizure. *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006); *Waldron*, 2012 U.S. Dist. LEXIS 128279, at *18; *see also, Powers v. Sickler*, 1995 U.S.

Dist. LEXIS 4735, at *21 n.5. "An officer has probable cause to arrest when he or she has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime,'" or a violation. *Jaegly*, 439 F.3d at 152 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)); *McDermott v. City of New York*, 2002 U.S. Dist. LEXIS 2893, at *18 (S.D.N.Y. Feb. 25, 2002). Probable cause is measured only at the time of the arrest.  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

Moreover, "well-established law in this Circuit requires [courts] to apply a presumption of probable cause when there is a grand jury indictment." *Bertuglia v. City* of New York, 133 F. Supp. 3d 608, 626 (S.D.N.Y. 2015). "[U]nder New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id*. (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)) (internal quotation marks and citation omitted) (emphasis in original).

> **The rule is founded upon the premise that the Grand Jury acts judicially and it may be presumed that it has acted regularly. The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.**

*Colon v. City of New York*, 60 N.Y.2d 78, 82-83 (1983).

6

Furthermore, "a court is not permitted to weigh the evidence presented to the grand jury to determine if there was probable cause. The indictment itself answers that question in the affirmative." *Bertuglia*, 133 F. Supp. 3d at 626.

Here, it is undisputed that Davis was formally indicted on October 2, 2015 by a grand jury, and was arrested subsequent and pursuant that indictment. *Exhibit "E,"* p. 53; *exhibit "O"*; *exhibit "D,"* p. 101; *exhibit "G,"* pp. 46-47. Evidence submitted to the grand jury in this case by way of testimonial and documentary evidence is not reviewable to assess whether probable cause was established. *Bertuglia*, 133 F. Supp. 3d at 626. Accordingly, there is a presumption of probable cause that can be rebutted exclusively by evidence that the indictment was "procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Bertuglia*, 133 F. Supp. 3d at 626; *see also Savino*, 331 F.3d at 72; *Colon*, 60 N.Y.2d at 82-83.

The record is bereft of any evidence capable of rebutting the presumed probable cause established in this case. The fact that Dr. Sikirica did not mention in his report that prolonged CPR was performed on V.D. by emergency personnel falls far short of any such evidence.

To wit: As a part of the autopsy, and in addition to the physical dissection and full workup of V.D., Dr. Sikirica also conducted a metabolic screening to rule out an inherited disease otherwise undetectable; did a full skeletal survey; obtained blood and viral cultures; performed toxicology testing; and reviewed records from V.D.'s pediatrician. *Exhibit "F,"* pp. 36, 81, 118, 121; *exhibit "L."*

7

At the time of the subject autopsy, Dr. Sikirica: **(1)** knew that V.D. was a healthy, normally developed toddler with no prior symptoms[1] [*Exhibit "F*," pp. 82, 121; *exhibit "A,"* pp. 33-34]; **(2)** was familiar with literature on CPR-related trauma [*exhibit "F,"* p. 57]; **(3)** was aware that V.D. received CPR at the scene and during transport to the hospital, and that CPR had been given to her over a long period [*Id*. at 54]; **(4)** knew that CPR in children can last a considerable amount of time, and sometimes rib fractures cannot be avoided [*Id*. at 58]; and **(5)**, knew that there were cumulatively thousands of chest compressions done by EMTs before and after V.D.'s arrival at the hospital [*Id*. at 55, 57]. He was also aware that the application of thousands of chest compressions is very common in children. *Id*. at 71-72, 75-76.

During the autopsy, Dr. Sikirica—who has performed over 10,000 autopsies—concluded that V.D. sustained fractures to the posterior (back) aspects of her ninth and tenth ribs. *Exhibit "F,"* pp. 19, 60, 63, 110. The fractures were sustained before V.D. passed away—conclusively or to a reasonable degree of medical certainty—and were caused by blunt-force trauma. *Id*. at 33, 125, 132. Critically, V.D. also exhibited massive abdominal hemorrhaging, which was caused by five lacerations in her liver. *Id*. at 65. The hemorrhaging caused 40 percent of V.D.'s overall blood volume to leak into her abdominal cavity. *Exhibit "M," p. 11*. The lacerations were observed before the liver was removed during the autopsy. *Id*. at 113. They were extremely severe, and would have bled profusely because they were very large and a portion of the liver had actually

---

[1] Davis stated that V.D. only seemed tired. *Exhibit "B,"* ¶ 15.

been torn away. *Exhibit "F,"* pp. 66, 79, 100. Dr. Sikirica did not note in his autopsy report that some of V.D.'s abdominal bleeding may have been from CPR, as that would be only an assumption, and he reports what he observes; unquestionably, the majority of the blood came from the severely lacerated liver, independent of CPR. *Id*. at 77, 91, 100.

Dr. Sikirica opined that the liver lacerations were most consistent with force applied to V.D.'s abdomen and the back simultaneously, similar to what Davis portrayed in the police video of his interview with Fountain and McDonald. *Id*. at 65. Regardless, had Dr. Sikirica not seen the video[2] of Fountain's interview—wherein Davis portrayed squeezing V.D.—he still would have opined that the severe compressive injury to her liver occurred due to compression of her abdominal cavity. *Id*. at 98, 117. It was his opinion that her injuries were not CPR-related injuries; instead, they were caused by blunt-force compression to V.D.'s abdomen, and were "vastly more severe than anything [Dr. Sikirica has] seen in CPR." *Id*. at 102, 132. Although V.D. had sustained rib fractures—and even assuming they were caused by CPR—which they were not[3]—they could not have caused the subject damage to her liver, and they could not have been caused by accident. *Id*. at 33, 125, 132; *exhibit "N,"* pp. 29, 33. Davis asserts in

---

[2] Although irrelevant and lacking in probative value, Davis claims that Dr. Sikirica reviewed the video of part of Davis's interrogation—together with other "police-generated materials"—before he performed the autopsy. The evidence shows, however, that this is not accurate. Dr. Sikirica reviewed the video after the autopsy and outside of police presence, as well as the TPD incident report. *Exhibit "F,"* pp. 84, 88-89; *exhibit "L,"* p. 5. Dr. Sikirica did also review a number of depositions from V.D.'s mother, several firefighters, and Dr. Crisafulli from St. Mary's Hospital. *Exhibit "L,"* p. 5. Again, County Law § 674 required a full investigation on the part of a medical examiner.

[3] Even with improperly performed CPR, V.D.'s injuries were beyond what would be expected in any CPR situation; these were blunt-force, severe, compressive injuries to the abdomen. *Exhibit "F,"* pp. 73-74, 100.

his complaint that Dr. Sikirica attributed the rib fractures to the lacerated liver; he did not. *Exhibit "L"*; *exhibit "F," pp. 91-93*.

Dr. Sikirica's observations and conclusions reached following the autopsy are supported by medical literature on hemorrhage from hepatic lacerations after CPR. *Exhibit "F,* pp. 23-24. For example, a Wake Forest University paper supports his opinions in this case, which was published in 2010. *Id*. at 24. That study revealed that close to 400 children who underwent CPR had no significant injuries; injuries, if any, were only to the airway around the mouth, with no deaths, and no major liver lacerations. *Id*.

In the case of V.D., her liver lacerations "went way beyond anything described in the literature or in [Dr. Sikirica's] experience. [He has] never seen more than one laceration of the liver with any person suffering from CPR, and [he's] never seen lacerations over the top of the liver like that. These were a question of quantity. The quantity of the lacerations, the five of them, are way beyond what would be expected in any kind of CPR situation." *Id*. at 66.

Certainly, there is no evidence in this case that Dr. Sikirica committed perjury, falsified his autopsy report, or intentionally omitted anything material from the report that would have influenced the grand jury. Although evidence presented to a grand jury is not susceptible of review to determine if probable cause exists for the arrest and prosecution—indeed, "[t]he indictment itself answers that question in the affirmative" [*Bertuglia*, 133 F. Supp. 3d at 626]—Dr. Sikirica's testimony before the grand jury was truthful, accurate, and consistent with his autopsy report. In particular, he testified that: (1) to a reasonable degree

10

of medical certainty, there was no evidence of any sickness or illness on autopsy [*exhibit "N,"* p. 31]; (2) 40 percent of V.D.'s overall blood volume had leaked into V.D.'s abdominal cavity [*Id*. at 24]; (3) V.D.'s injuries could not have been the result of CPR [*Id*. at 34]; (4) even if V.D.'s rib fractures had been caused by CPR—which, again, they were not—they could not have caused the subject damage to her liver [*Id*. at 29]; (5) the trauma to V.D.'s liver could not have been caused by accident, with the exception of perhaps a motor-vehicle accident, which clearly did not apply [*Id*. at 33-34]; and (6), V.D. lost consciousness due to bleeding into her abdominal cavity from the liver lacerations, and that there is no other explanation [*Id*. at 37].

While Dr. Sikirica may not have mentioned the number of chest compressions applied to V.D. in the autopsy report, or that CPR was prolonged, these facts were neither medically significant, nor likely to influence the grand jury. The application of thousands of chest compressions is very common in children. *Exhibit "F,"* pp. 71-72, 75-76. It was assumed—and reasonably so—that CPR would have been performed on V.D. in transit to the hospital and at the hospital until she was pronounced dead. *Id*. at 101. Importantly, Dr. Sikirica was clear and unequivocal during the course of his grand-jury testimony that CPR—without qualification as to the amount or duration—did not cause the fatal injuries at issue. *Exhibit "N," pp. 29, 34*.

**C.** *Dr. Sikirica was not the proximate cause of Davis's arrest and prosecution.*

Dr. Sikirica did not make the decision to arrest or prosecute Davis. *Exhibit "F,"* p. 83; *exhibit "E,"* p. 59. The TPD, Dr. Sikirica, and the DA's office were all

armed with the same information relative to V.D.'s death, and there is no evidence to the contrary. But the determination as to whether a case is prosecutable is a legal determination only; not a medical one made by Dr. Sikirica. *Exhibit "F,"* p. 59. Accordingly, Sikirica was not the proximate cause of the prosecution against Davis. *Bertuglia*, 133 F. Supp. 3d at 630.

### D. Sikirica and Abelove did not act with malice.

Under New York law, malice is interpreted as meaning "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something more than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502-03 (1978).

Davis's third amended complaint asserts only threadbare allegations that Sikirica and Abelove acted with malice. *Exhibit "B,"* generally. Aside from conclusory remarks, there is a lack of evidence in any form or format to suggest that either defendant had any improper motive or desire to initiate or continue the prosecution against Davis, with whom they had never even met. *Exhibit "D,"* p. 107.

### E. Abelove was not personally involved in any alleged constitutional violations.

To recover damages under § 1983, a defendant must be personally responsible for a plaintiff's constitutional deprivation. *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989); *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("personal involvement of defendants in

alleged constitutional deprivations is a prerequisite to an award of damages under §
1983") (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).

Here, it is true that Abelove served as the district attorney for Rensselaer County
during the investigation through the completion of Davis's criminal trial. *Exhibit "E,"* p. 6.
But, he did not attend any meetings with TPD or Dr. Sikirica in this case. *Id*. at 47. He
did not meet or talk with any defendant officers in connection with subject investigation.
*Id*. at 98-99; *exhibit "K,"* p. 36; *exhibit "G,"* p. 92; *exhibit "H,"* p. 93. He did not see the
video of Davis's interrogation by TPD. *Exhibit "E,"* p. 47. He was not involved in the trial
preparation of any witness, and was not involved in trial preparation with any assistant
district attorney. *Id*. at 69. He did not have any involvement in the direction or handling
of any other aspect of the subject investigation. *Id*. at 50; *exhibit "G,"* p. 43; *exhibit "D,"*
pp. 165-66; *exhibit "I,"* pp. 56-57.

Lastly, there can be no supervisory liability as against Avelove relative to any
constitutional claims: "The Second Circuit recently clarified that there is no special rule
for supervisory liability and explained that a plaintiff must plead and prove that each
Government-official defendant, through the official's own individual actions, has violated
the Constitution." *Solano v. New York*, 2021 WL 4134793, at *6 (N.D.N.Y. Sep. 10,
2021) (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (internal
quotation marks and citation omitted).

In light of the foregoing, Davis's false-arrest, malicious-prosecution, and right-to-
a-fair trial claims against Dr. Sikirica and Abelove should be dismissed.

### *POINT II*

## DR. SIKIRICA AND ABELOVE ARE ENTITLED TO ABSOLUTE IMMUNITY.

*i.     Dr. Sikirica*

"Absolute immunity gives public officials entrusted with sensitive tasks a protected area of discretion within which to carry out their responsibilities. Specifically, judges, prosecutors, and other persons acting under color of law who perform official functions in the judicial process are fully protected from liability for their judicial acts." *Newton v. City of New York*, 738 F. Supp. 2d 397, 404 (S.D.N.Y. 2010) (internal quotation marks and citations omitted).

In New York State, a medical examiner's determination of manner of death is a quasi-judicial determination. *Leib v. Paparo*, 84 A.D.2d 538 (2nd Dept. 1981); *Babi-Ali v. City of New York*, 979 F. Supp. 268, 279 (S.D.N.Y. 1997). Government officials performing quasi-judicial functions are generally afforded absolute immunity for those functions. *Tarter v. State*, 68 N.Y.2d 511, 518 (1986) (holding that "[l]ogically, other neutrally positioned government officials, regardless of title, who are delegated judicial or quasi-judicial functions should also not be shackled with the fear of civil retribution for their acts").

In *Newton*, the Southern District noted that "courts have extended a cluster of immunities [to protect] the various participants in judge-supervised trials, including…coroners…" *Newton*, 738 F.Supp.2d at 406-07 (alteration in original) (internal quotation marks and citations omitted); *see also Mills v. Small*,

14

446 F.2d 249 (9th Cir. 1971) (holding that county medical examiner was acting in a quasi-judicial capacity and thus, immune from liability under 42 U.S.C. § 1983).

It is submitted that the purpose served by absolute immunity as articulated by the United States Supreme Court is met in the historic, statutory, and practical function played by a county medical examiner. *Forrester v. White*, 484 U.S. 219, 226–27 (1988); *Butz v. Economou*, 438 U.S. 478, 510 (1978); *see also* Leib, 84 A.D.2d at 538; *Mills*, 446 F.2d at 249; *Salomon v. Mahoney*, 271 A.D. 478, 480 (4th Dept. 1946). The rationale to support a finding of immunity is clear: A medical examiner is statutorily required to investigate certain deaths and report their findings to the district attorney, as well as other government officials.

Considering the above precedent, the evidence here shows that Dr. Sikirica engaged only in duties relating to his specific role as medical examiner, and in which he was required to engage under County Law § 674. To hold differently, given the facts of this case, would expose medical examiners  to harassing litigation based on manner-of-death determinations—particularly involving a homicide manner of death—solely to impair their independent judgment.

### ii.  Abelove

It is well established that "a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution" [*Imbler v. Pachtman*, 424 U.S. 409, 410 (1976)], "is immune from a civil suit for damages under § 1983." *Id*. at 431. "The Courts of Appeals…are virtually unanimous that a

prosecutor enjoys absolute immunity from § 1983 suits for damages when he acts within the scope of his prosecutorial duties." *Id*. at 420; *see also Kalina v. Fletcher*, 522 U.S. 118 (1997); *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (holding that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity").

The rationale for conferring absolute immunity in such circumstances is that "the public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." *Imbler*, 424 U.S. 409 at 424-25.

It is likewise well settled that civil actions relating to a prosecutor's handling and presentation of evidence are squarely within a prosecutor's advocacy function and, thus, entitled to absolute immunity. *Linda R. S. v. Richard D.*, 410 U.S. 614 (1973). For instance, the complete failure to disclose certain exculpatory evidence, and the timing of a prosecutor's disclosure of exculpatory evidence, is intimately connected to his or her role as an advocate for the state; absolute immunity applies. *Warney v. Monroe County*, 587 F.3d 113, 125 (2d Cir. 2009) ("[I]f [during trial] the prosecutors had tested all the evidence, and then sat on the exculpatory results for at least 72 days, they may well have violated *Brady v. Maryland*…but they would be absolutely immune from personal liability"); *Lawlor v. Connelly*, 471 Fed. Appx. 64, 65 (2d Cir. 2012) ("This Court has repeatedly held…that a prosecutor is absolutely immune from liability under 42 U.S.C. § 1983 for his conduct before a grand jury…this Court has specifically

16

held that a prosecutor is immune from § 1983 liability for withholding exculpatory evidence from a grand jury") (internal citations omitted).

Furthermore, prosecutors assuming a supervisory role are also absolutely immune from Section 1983 liability, insofar as it implicates their advocacy function. *Van de Kamp v. Goldstein*, 555 U.S. 335, 345 (2009).

Davis alleges that Abelove "was actively involved in requesting and reviewing documents, communicating with the TPD defendants, and otherwise actively participating in, overseeing, or otherwise involved in the investigation…" *Exhibit "B,"* ¶ 31.

Again, as set forth in "Point I(E)," above, Abelove was not involved with this case. Assuming *arguendo* that Davis's allegations are accurate, the described activity falls well within the ambit of his prosecutorial duties and advocacy function. Accordingly, Abelove is entitled to absolute immunity. *Imbler*, 424 U.S. at 431; *Linda R. S.*, 410 U.S. 614; *Warney*, 587 F.3d at 125; *Lawlor*, 471 Fed. Appx. at 65; *Van de Kamp*, 555 U.S. at 345.

### *POINT III*

### DR. SIKIRICA AND ABELOVE ARE ENTITLED TO QUALIFIED IMMUNITY.

  *i.*  *Dr. Sikirica*

"A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it

17

occurred; or (3) if the defendant's action was objectively legally reasonable…in light of the legal rules that were clearly established at the time it was taken." *Costello v. Milano*, 20 F. Supp. 3d 406, 416 (S.D.N.Y. 2014) (internal quotation and citation omitted). "Thus, qualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id*. (internal quotation marks and citation omitted).

In *Ferris v. City of Cadillac*, 272 F. Supp. 3d 1003 (W.D. M.I. 2017), the court analyzed multiple cases involving the question of qualified immunity in the context of forensic medical examiners. In doing so, it held that "qualified immunity is designed…to ensure that professionals are willing to engage in the difficult, yet critically important, task of investigating the unexplained death of children while in the custody of their parents or other caretakers."  *Id*. at 1010.

The Sixth Circuit affirmed the district court's granting of qualified immunity to the medical examiner in *Ferris*: "In sum, the record supports that Dr. de Jong attempted to conduct a through autopsy. Whether [s]he succeed is immaterial [to] establishing a Fourth Amendment violation…the record at best reveals that Defendants were negligent in their investigation, and such a conclusion does not establish a constitutional violation." *Ferris v. City of Cadillac, Mich.*, 726 Fed. Appx. 473, 483 (6th Cir. 2018).

Davis's claim against Sikirica is based only upon his alleged omission in the autopsy report of the EMTs' and hospital staff's administration of CPR for a prolonged period of time; and (2), classifying the manner of V.D.'s death as a homicide. *Exhibit "B,"* ¶¶ 36-37. Dr. Sikirica did not include in his report that

18

emergency personnel performed CPR essentially continuously until V.D. was pronounced dead, as that information was assumed. *Exhibit "F,"* pp. 71-72, 75-76. It was objectively legally reasonable for him to do so. At the very most, Dr. Sikirica's omission constituted negligence; not a constitutional violation addressable by way of Section 1983. *Ferris*, 726 Fed. Appx. at 483.

### ii.     Abelove

In the event that the Court declines to hold that Abelove is entitled to absolute immunity—and also finds that he was personally involved in this investigation and prosecution—he is nevertheless entitled to qualified immunity. Under no interpretation of the evidence can Abelove be found to have been "plainly incompetent," or knowingly violative of the law. *Costello*, 20 F. Supp. 3d at 416.

Accordingly, Davis's causes of action against Dr. Sikirica and Abelove should be dismissed.

### POINT IV

### DAVIS'S CONSPIRACY CLAIM PURSUANT TO 42 U.S.C. § 1983 FAILS AS A MATTER OF LAW, AND SHOULD BE DISMISSED.

"To prove a Section 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).

For the reasons set forth in "Point I(E)" above, this claim should be dismissed against Abelove. He had no personal involvement in any facet of the investigation or trial of this matter.

With regard to Dr. Sikirica, as an initial matter, and as previously demonstrated, Davis did not sustain an unconstitutional injury. Even if the Court were to find a question as to the existence of such an injury, there is no evidence to support a finding that defendants acted in concert to inflict it. While the defendants had some expected level of corroboration, they acted independently.

Davis appears to take issue with law-enforcement's attendance at the autopsy. Assistant District Attorney Andra Ackerman McDonald, Fountain, Colaneri, and evidence-technician Buttafuoco all attended. *Exhibit "F,"* pp. 20, 120. There are no guidelines, rules, or best practices, however, governing law-enforcement attendance at autopsies, especially in childhood death cases; sometimes they attend, sometimes they do not. *Id*. at 21, 38, 87, 153. They are there to offer information about the case. *Id*. In fact, Colaneri has attended over 200 autopsies during the span of his career, and attends most autopsies on cases that he is investigating. *Exhibit "I,"* pp. 30-31. Similarly, Andra Ackerman's presence at the autopsy of a toddler was customary. *Id*. at 32. Moreover, County Law § 674 requires medical examiners to fully investigate the cause of death, which specifically includes fact-finding from witnesses and cooperating with law enforcement. County Law. § 674(2). The law is clear that conduct that is routine and necessary as part of an investigation does not support a cause of action for

conspiracy. *San Filippo v. U.S. Trust Co. of New York*, 737 F.2d 246, 256 (2d Cir. 1984); *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 792 (2d Cir. 2007).

Additionally, Dr. Sikirica factored in information that was conveyed to him by law enforcement, but only information that he deemed relevant. *Exhibit "F," pp. 153-55*. TPD did not influence the autopsy report in any way, and they did not attempt to exert undue influence on his medical determinations; unquestionably, no one told him to rule V.D.'s death a homicide. *Id*. at *89, 154-55*. Furthermore, during the course of the subject investigation—and after the issuance of the autopsy report—Dr. Sikirica met with an assistant district attorney, but also with Davis's criminal-defense attorney, and on one occasion, met with both of them at the same time. *Id*. at 26; e*xhibit "M," p. 71; exhibit "F," p. 26*. And while Dr. Sikirica testified before the grand jury, the DA's office did not prepare him for his testimony; they merely instructed him to be there. *Exhibit "F,"* p. 45.

Accordingly, as there is no evidence that Dr. Sikirica, or Abelove, conspired to violate Davis's constitutional rights, Davis's Section 1983 conspiracy claim[4] should be dismissed.

### POINT V

### DAVIS'S FAILURE TO INTERVENE CLAIM BROUGHT PURSUANT TO SECTION 1983 FAILS AS A MATTER OF LAW AS AGAINST ABELOVE; DISMISSAL IS WARRANTED.

A failure-to-intervene claim is premised on the recognition that "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."

---

[4] Davis also alleges a Section 1985 conspiracy claim in his fifth cause of action. *Exhibit "B,"* p. 14. This cause of action was abandoned by Davis and dismissed by the Court via its March 8, 2019 memorandum-decision and order of the Hon. Frederick J. Scullin, Jr. [Dkt. No. 35, p. 27].

*Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (internal citations omitted). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official. In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Id*. (internal citations omitted).

As defendants have demonstrated the existence of probable cause for Davis's arrest and prosecution, his claim for failure to intervene should also be dismissed. *See Feinberg v. City of New York*, 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004) ("[S]ince Defendants had probable cause to arrest and charge the Plaintiff, Defendants' motion for summary judgment on [the failure-to-intervene claim] is granted").

Furthermore, and as additional grounds for dismissal, the record is clear: There was no personal involvement on the part of Abelove, and any claim against him based upon supervisory liability must fail. *See* "Point I(E)," above; *Van de Kamp*, 555 U.S. at 345; *Solano*, 2021 WL 4134793, at *6.

### *POINT VI*

### DAVIS HAS FAILED TO SUFFICIENTLY PROVE A 42 U.S.C. § 1983 CLAIM AGAINST COUNTY OF RENSSELAER, AND ACCORDINGLY, HIS SEVENTH CAUSE OF ACTION SHOULD BE DISMISSED.

Pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and its extensive progeny, it is well settled that a municipality cannot be held liable under 42 U.S.C. § 1983 based upon the theory of *respondeat superior*. *Monell*, 436 U.S. 658;

22

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).  Therefore, in order to adequately prove a Section 1983 claim against a municipality, a plaintiff must demonstrate that the municipality maintained a particular unconstitutional policy or custom that caused a deprivation of constitutional rights.  *Monell*, 436 U.S. at 694; *Sarus v. Rotundo*, 831 F.2d 397, 400 (2d. Cir. 1987).

"*Monell* does not provide a separate cause of action...; it *extends* liability to a municipal organization where that organization's…policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (alteration in original). In other words, if Davis's claims against Dr. Sikirica and Abelove fail—defendants respectfully suggest that they must— then his *Monell* claim must fail *ipso facto*. *Id*.

### POINT VII

### DAVIS HAS FAILED TO DEMONSTRATE AN ENTITLEMENT TO PUNITIVE DAMAGES AS AGAINST DR. SIKIRICA AND ABELOVE.

"[P]unitive damages against government officials are warranted only if the conduct was 'motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Session v. Erie County Sheriff Dep't*, 2013 U.S. Dist. LEXIS 46818, at *15-16 (W.D.N.Y. Mar. 11, 2013) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

Only a moment's consideration is necessary to conclude that Davis has failed to sufficiently allege any facts capable of sustaining an award of punitive damages against Dr. Sikirica and Abelove under this standard. *Exhibit "B,"* generally.

## CONCLUSION

For the reasons set forth above, together with those supporting facts set forth within the statement of material facts and all exhibits thereto, Defendants Rensselaer County, Michael Sikirica, and Joel Abelove respectfully ask that the Court grant their motion for summary judgment in its entirety.

Dated:  February 4, 2022

**BAILEY, JOHNSON & PECK, P.C.**

By: _____

       William C. Firth
       Bar Roll No. 513832
Attorneys for Defendants Rensselaer County,
Michael Sikirica, and Joel Abelove
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, New York 12205