UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                                        Plaintiff,

                                                                        17 CV 1290 (DJS)

            -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually, and JOHN and
JANE DOE 1-10, Individually,

                                        Defendants.

--------------------------------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO THE CITY AND COUNTY
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

                                        BRETT H. KLEIN, ESQ., PLLC
                                        *Attorneys for the Plaintiff*
                                        305 Broadway, Suite 600
                                        New York, New York 10007
                                        (212) 335-0132

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................ii

PRELIMINARY STATEMENT..........................................................................................1

STATEMENT OF FACTS..................................................................................................3

STANDARD OF REVIEW………………………………………………………………..12

ARGUMENT………………………………………………………………………….....12

    I.       PLAINTIFF WAS MALICIOUSLY PROSECUTED…………………………...12

          A.     Coonradt, McDonald, Colaneri, Sikirica, and Abelove all Participated in the Initiation of the Prosecution…………………………………………..…13

               i.      Coonradt, McDonald, And Colaneri Aided in The Initiation of The Prosecution…………………………………………………14

               ii.     Sikirica And Abelove Were Also Involved in Initiating the Prosecution…………………………………………………....16

          B.     Probable Cause to Prosecute Plaintiff Was Lacking ……………………19

          C.     Questions of Fact Exist as To Whether Defendants Acted with Malice …23

          D.     Plaintiff's State Law Malicious Prosecution Claim Should Also Proceed to Trial……………………………………………………………………24

    II.      DEFENDANTS DENIED PLAINTIFF HIS RIGHT TO A FAIR TRIAL ….....25

    III.     REASONABLE INFERENCES SUPPORT PLAINTIFF'S CONSPIRACY CLAIM……………….……………………………………………………..28

    IV.    FAILURE TO INTERVENE SHOULD PROCEED TO TRIAL ………………31

    V.     THE CITY DEFENDANTS AND SIKIRICA ARE NOT ENTITLED TO IMMUNITY…………………………………………………………………...32

          A.     Defendant Sikirica Is Not Entitled to Absolute Immunity………………32

          B.     Defendant Sikirica Is Not Entitled to Qualified Immunity………………34

          C.     The City Defendants are not Entitled to Qualified Immunity……………36

VI.     PLAINTIFF'S CLAIM FOR MUNICIPAL LIABILITY SHOULD PROCEED..37

VII.    PUNITIVE DAMAGES…………………………………………..……………..40

CONCLUSION...................................................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Aguirre v. City of New York*, No. 15 Civ. 6043 (PKC), 2017 WL 4236552 (E.D.N.Y. Sept. 22, 2017) ................................................................................................................... 14, 16

*Alwan v. City of New York*, 311 F. Supp. 3d 570 (E.D.N.Y. 2018) ............................... 38

*Anderson v. Branen,* 17 F.3d 552 (2d Cir.1994) .......................................................... 31

*Anderson v. City of New York*, 817 F.Supp.2d 77 (E.D.N.Y. 2011) ............................ 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 12

*Bailey v. City of New York*, 79 F. Supp. 3d 424 (E.D.N.Y. 2015) ......................... 24, 37

*Blake v. Race*, 487 F. Supp. 2d 187 (E.D.N.Y. 2007) ............................................ 36, 37

*Boyd v. City of New York,* 336 F.3d 72 (2d Cir.2003) ....................................... 19, 23, 24

*Brandon v. City of New York*, 705 F. Supp. 2d 261 (S.D.N.Y. 2010) .......................... 24

*Brewer v. Hayne*, No. 13 Civ. 898 (HTW)(LRA), 2015 WL 13544751 (S.D. Miss. Apr. 16, 2015), *aff'd*, 860 F.3d 819 (5th Cir. 2017) ............................................................... 33

*Brown v. Miller*, 519 F.3d 231 (5th Cir. 2008) ............................................................ 35

*Buari v. City of New York*, 530 F.Supp.3d 356 (S.D.N.Y. 2021) .................... 24, 25, 38

*Buchy v. City of White Plains*, No. 14 CV 1806 (VB), 2015 WL 8207492 (S.D.N.Y. Dec. 7, 2015) ................................................................................................................... 31

*Cameron v. City of New York*, 598 F.3d 50 (2d Cir. 2010) .......................................... 14

*Chimurenga v. City of New York*, 45 F. Supp. 2d 337 (S.D.N.Y. 1999) ...................... 14

*Coggins v. County of Nassau*, 988 F.Supp.2d 231 (E.D.N.Y. 2013) ...................... 31, 32

*Costello v. Milano*, 20 F.Supp.3d 406 (S.D.N.Y. 2014) .............................................. 14

*Crews v. County of Nassau*, 996 F. Supp. 2d 186 (E.D.N.Y. 2014) ............................ 24

*Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003) ........................................................ 36, 37

*Davis-Guider v. City of Troy*, No. 117 CV1 290 (FJS)(DJS), 2019 WL 1101278 (N.D.N.Y. Mar.

8, 2019) ........................................................................................................................ 33

*Davis-Guider v. City of Troy*, No. 17 CV 1290 (DJS), 2019 WL 1101278 (N.D.N.Y. Mar. 8,

2019) ............................................................................................................................. 38

*Decayette v. Goord*, No. 06 CV 0783, 2009 WL 1606753 (N.D.N.Y. 2009) ............................. 31

*Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443 (S.D.N.Y. 2012) ..................................... 24, 28

*Elfers v. Varnau*, 101 F. Supp. 3d 753 (S.D. Ohio 2015) ........................................................ 33

*Ferris v. City of Cadillac*, 272 F. Supp. 3d 1003 (W.D. M.I. 2017) .......................................... 34

*Garnett v. City of New York*, 13 CV 7083 (GHW), 2014 WL 3950904 (S.D.N.Y. Aug. 13, 2014)

.................................................................................................................................... 25

*Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016) ......................................... 27

*Green v. City of New York*, 465 F.3d 65 (2d. Cir. 2006) ........................................................ 36, 37

*Hamilton v. City of New York*, No. 15 CV 4574 (CBA)(SJB), 2019 WL 1452013 (E.D.N.Y. Mar.

19, 2019) ...................................................................................................................... 17

*Harewood v. Braithwaite*, 64 F. Supp. 3d 384 (E.D.N.Y. 2014) ................................................ 40

*Harrison v. Ford Motor Co.*, No. 11 Civ. 0840 (MAD) (DEP), 2013 WL 3098695 (N.D.N.Y.

June 18, 2013) ............................................................................................................... 40

*Haskins v. Jackson*, No. 15 Civ. 2016 (MKB), 2020 WL 6705640 (E.D.N.Y. Nov. 10, 2020)... 40

*Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007) ................................................................. 17

*Hill v. City of New York*, 45 F.3d 653 (2d Cir. 1995) ............................................................. 33

*Hincapie v. City of New York*, 434 F. Supp. 3d 61 (S.D.N.Y. 2020) ......................................... 25

*Hinkle v. City of Clarksburg,* 81 F.3d 416 (4th Cir. 1996) ....................................................... 28

iv

*Hydro Inv'rs. Inc. v. Trafalgar Power Inc.*, 227 F.3d 8 (2d Cir. 2000) ........................ 17

*Isaac v. City of New York*, No. 16 Civ. 4729 (KAM), 2018 WL 5020173 (E.D.N.Y. Aug. 6,
2018), *report and recommendation adopted*, No. 16 Civ. 4729 (KAM)(RLM), 2018 WL
4583481 (E.D.N.Y. Sept. 24, 2018 ............................................................ 37

*Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004) ........................................ 36

*Kirchner v. Cty. of Niagara*, 107 A.D.3d 1620 (2013) .......................................... 25

Kompare v. Stein, 801 F.2d 883 (7th Cir. 1986) .............................................. 33

*Kramer v. Showa Denko K.K.*, 929 F.Supp. 733 (S.D.N.Y. 1996) ............................... 40

*Lanning v. City of Glens Falls*, 908 F.3d 19 (2d Cir. 2018) ............................. 13, 24

*Lawyer v. Kernodle*, 721 F.2d 632 (8th Cir. 1983) ............................................ 33

*Lin v. County of Monroe*, 66 F.Supp.3d 341 (W.D.N.Y. 2014) ................................... 39

*Llerando–Phipps v. City of New York,* 390 F.Supp.2d 372 (S.D.N.Y.2005) ................. 14, 15

*Lozada v. Weilminster*, 92 F.Supp.3d 76 (E.D.N.Y. 2015) ...................................... 39

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010) ............................ 19, 24

*Marshall v. Sullivan*, 105 F.3d 47 (2d Cir. 1996) ........................................ 19, 23

*Mickle v. Morin*, 297 F.3d 114 (2d Cir. 2002) ........................................... 36, 37

*Newton v. City of New York*, 738 F.Supp.2d 397 (S.D.N.Y. 2010) .............................. 32

*Noga v. City of Schenectady Police Officers*, 169 F. Supp. 2d 83 (N.D.N.Y. 2001).................. 16

*Pangburn v. Culbertson,* 200 F.3d 65 (2d Cir.1999) .......................................... 28

*People v. Thomas*, 22 N.Y.3d 629 (2014)..................................................... 30

*Perez v. Duran*, 962 F. Supp. 2d 533 (S.D.N.Y. 2013) ........................................ 36

*Phelps v. City of New York*, No. 04 Civ. 8570 (DLC), 2006 WL 1749528 (S.D.N.Y. June 27,
2006) ........................................................................................ 14

*Randle v. Alexander*, 170 F. Supp. 3d 580 (S.D.N.Y. 2016) ......................................................... 31

*Rentas v. Ruffin*, 816 F.3d 214 (2d Cir. 2016) .............................................................................. 23

*Reynolds v. Giuliani*, 506 F.3d 183 (2d Cir. 2007) ....................................................................... 38

*Ricciuti v. N.Y.C. Transit Athy.*, 124 F.3d 123 (2d. Cir. 1997) ............................................... 26, 37

*Rodriguez v. City of New York*, 72 F.3d 1051 (2d Cir. 1995) ........................................................ 12

*Ross v. Township of Woodbridge*, No. 09-cv-1533, 2010 WL 1076275 (D.N.J. Mar. 23, 2010). 16

*Sanders v. City of New York*, No. 12 CV 113 (PKC)(LB), 2015 WL 1469514 (E.D.N.Y. Jan. 7,

    2015) ............................................................................................................................... 19, 23

*Scotto v. Almenas*, 143 F.3d 105 (2d Cir. 1998) .................................................................. 34, 35, 36

*Shmueli v. City of New York*, 424 F.3d 231 (2d Cir. 2005) ........................................................... 18

*Stein v. Janos*, 269 F. Supp. 2d 256 (S.D.N.Y. 2003) ................................................................... 28

*Struthers v. City of New York*, No. 12 CV 0242 (JG), 2013 WL 2390721 (E.D.N.Y. May 31,

    2013) ........................................................................................................................................ 26

*Thagard v. Lauber*, 317 F. Supp. 3d 669 (W.D.N.Y. 2018) ......................................................... 37

*Thomas v. City of Troy*, 293 F. Supp. 3d 282 (N.D.N.Y. 2018), *on reconsideration sub nom.*

    *Thomas v. Mason*, No. 1:17-CV-626 (DJS), 2019 WL 6111572 (N.D.N.Y. Nov. 18, 2019) .. 33

*Triolo v. Nassau Cty.*, 24 F.4th 98 (2d Cir. 2022) ......................................................................... 25

Vann v. City of New York, 72 F.3d 1040 (2d Cir. 1995) ................................................................. 38

*Wong v. Yoo*, 649 F. Supp. 2d 34 (E.D.N.Y. 2009) ....................................................................... 13

*Ying Li v. City of New York*, 246 F.Supp.3d 578 (E.D.N.Y. 2017) ............................................... 33

*Zanfardino v. City of New York*, 230 F. Supp. 3d 325 (S.D.N.Y. 2017) ...................................... 12

*Zellner v. Summerlin*, 494 F.3d 344 (2d Cir. 2007) ...................................................................... 36

**Other Authorities**

John Rafael Peña Perez, *Confronting the Forensic Confirmation Bias*, 33 Yale L. & Pol'y Rev.

    457, 460 (2015) ........................................................................................................... 2

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................... 12

Fed. R. Civ. P. 8 ............................................................................................................. 31

## PRELIMINARY STATEMENT

On February 26, 2015, plaintiff Michael Davis-Guider (hereinafter "plaintiff" or "Davis"), found his girlfriend's daughter, V.D. unresponsive in her bed.  V.D., who Davis loved and cared for as a daughter, sadly and tragically died of natural causes.  Davis, upon discovering V.D. in her unconscious state, attempted CPR briefly, and improperly, before calling 911.  Emergency Medical Services (hereinafter "EMS") and thereafter hospital staff would proceed to do approximately 6,000 more chest compressions on V.D.  V.D. never regained consciousness and was pronounced dead approximately one hour after EMS arrived at plaintiff's home.  A distraught Davis fully cooperated with police over an approximate seven-month investigation, consistently telling police the same story, to wit: that V.D. had awoken sluggish and tired, which was not normal for her.  That he changed her diaper, offered her water and food, which she declined, and put her back to bed because she seemed tired.  Davis fell asleep himself and awoke to find V.D. not breathing and unresponsive.  All of the evidence collected by police, including the soiled diaper, sippy cup, and pants still on the floor near where Davis had changed V.D. and offered her water that morning, would support the truth of Davis' story.  V.D. presented with no outward injuries or bruising to her body and V.D.'s mother corroborated the information provided by Davis, including that V.D. seemed tired and not her normal self in the morning.  The TPD defendants concede they lacked probable cause to arrest plaintiff based off any evidence they collected.

Following V.D.'s death, defendant Dr. Michael Sikirica, the medical examiner for Rensselaer County, performed V.D.'s autopsy and found two nondisplaced rib fractures and lacerations to V.D.'s liver, which defendant Sikirica initially documented and still concedes were injuries consistent with Davis' explanation of his improper attempt at CPR.  Liver lacerations and rib fractures are also consistent with injuries typical of prolonged CPR, as occurred here.  Despite

that defendant Sikirica's findings and all the evidence gathered by the Troy Police Department (hereinafter "TPD") fully and consistently supported Davis' explanation of the morning's events, that V.D.'s injuries were CPR related, either via Davis' failed attempt at CPR, or at the hands of the many individuals who performed CPR after him, and therefore Davis' innocence of any crime and not his guilt, and despite the lack of any evidence suggesting Davis had engaged in any conduct which injured V.D. prior to V.D. being found unresponsive and not breathing, defendants took a myopic view of the case, rigidly focusing on Davis and their homicide theory to the exclusion of all other evidence to the contrary, resulting in what is known as a forensic confirmation bias. *See* John Rafael Peña Perez, *Confronting the Forensic Confirmation Bias*, 33 Yale L. & Pol'y Rev. 457, 460 (2015).  In this effort to ensure Davis would be blamed, Sikirica labeled V.D.'s death a homicide, initially attributing her death to CPR specifically performed by Davis' large hands and assuming. without any medical basis, that CPR done by other professionals with other sized hands would not have injured V.D.

Thereafter, apparently realizing that the initial medically unsound finding that Davis alone had injured V.D. in the process of attempting CPR neither supported a homicide determination, nor probable cause to prosecute Davis for manslaughter, defendants Sikirica, along with TPD officers including Ronald Fountain, Charles McDonald, Tim Colaneri, and Danielle Coonradt, and the Rensselaer County District Attorney's Office (hereinafter "RCDAO"), attempted to minimize and avoid this obvious result through withheld, false, and/or altered evidence which was then offered against Davis in the ensuing prosecution initiated against him, which was intended to support that the injuries had apparently occurred some other time than when Davis performed CPR.[1]  Thankfully, this attempt to avoid the truth failed, and after spending approximately 10

---

[1] Plaintiff does not oppose defendant Mason's dismissal from the action.

months in jail awaiting and during trial, Davis was ultimately found wholly innocent of these unfounded charges and acquitted by a jury.

## STATEMENT OF FACTS

Plaintiff's claims arise from the death of his girlfriend's daughter, V.D.  Plaintiff loved and cared for her V.D. as if she was his own daughter.  Plaintiff's 56.1 Counter Statement (hereinafter "PCS") ¶ 1.  The night before V.D.'s death, Michael Davis watched basketball with a friend across the street, while V.D. remained home with her mother Rebecca Parker, and V.D. was already asleep when Davis returned home.  PCS ¶ 6.  On February 26, 2015, when Davis woke up in the morning, he smelled poop and called V.D. out from her room to the living room where he and Rebecca slept.  PCS ¶ 7.  When V.D. came out to Davis, she appeared low energy, sluggish, and not her normal self.  PCS ¶ 8.  Approximately one week before her death, V.D. had been sick with a fever, coughing, and vomiting, and had complained of chest pain.  PCS ¶¶ 2-3.  V.D. also suffered from low iron, and a postmortem metabolic screening detected an elevated thyroid stimulation hormone consistent with hypothyroidism.  PCS ¶¶ 4.  V.D.'s autopsy further revealed evidence of chronic inflammation of the bronchi.  PCS ¶ 5.

Davis helped V.D. finish going to the bathroom, changed V.D.'s diaper, and offered her food and a sippy cup, which V.D. declined.  PCS ¶ 9.  Consistent with Davis' explanation of the morning events, police would later find a sippy cup, soiled diaper, and pants on the floor near the bed in the living room, and V.D. in a clean unsoiled diaper.  PCS ¶ 10.  Seeing that V.D. appeared abnormally tired, Davis put her back to bed PCS ¶ 11.  Davis put on a movie in the living room and fell asleep himself.  PCS ¶ 12.  When Davis woke up, he found V.D. unresponsive in her bed. PCS ¶ 13.  Davis attempted CPR a few times, including doing a few compressions where he

pressed down on her stomach with his hand behind her back, and then at 1:09 p.m., called 911 from a restaurant across the street because he did not have a working phone at home. PCS ¶ 14.

When emergency medical service providers (hereinafter "EMS") arrived at the scene, V.D. was already in cardiac arrest, was not breathing, had no pulse, no heart activity, and was warm to the touch. PCS ¶ 15. EMS immediately started CPR in the home, improperly using two hands pressing hard on V.D. while she was on a soft futon. PCS ¶¶ 16-17. CPR was continued in the ambulance en route to St. Mary's Hospital. PCS ¶ 18. Davis and Parker were not given an opportunity to go with V.D. in the ambulance. PCS ¶ 19. EMS performed 100 to 120 compressions per minute for the 20 minutes CPR was performed in the home and on the way to the hospital. PCS ¶ 20. At no time did V.D. regain a pulse or start breathing. PCS ¶ 22. CPR was continued at the hospital for another thirty minutes, before V.D. was pronounced dead at 2:10 p.m. PCS ¶ 23. EMS and hospital staff collectively did a total of approximately 6,000 compressions. PCS ¶ 24.

Defendant Troy Police Department (hereinafter "TPD") Officer Danielle Coonradt was the first officer to respond to the scene and despite that per EMS, V.D. had no visible injuries, Coonradt began searching the house in a manner that indicated she was suspicious of something, including opening cupboards and looking in high places. PCS ¶ 25. Coonradt also questioned plaintiff and prepared an inaccurate report of her conversation with Davis, falsely recording in an official police report that Davis told her he tried to wake V.D. up at 11:00 a.m., and that he responded to Coonradt's statement that it was now 1:30 p.m. by stating that time must be flying. PCS ¶ 26. To the contrary, Davis told the police that he was not sure what time he woke up because he didn't have a clock in the house and his phone was not working. PCS ¶ 27.

Defendants former TPD Detective Ronald Fountain and Detective Charles McDonald were jointly assigned to conduct the investigation of the case and also responded to the Mr. Davis' home on February 26, 2015.  PCS ¶ 28.  Fountain told plaintiff he would be driven to the hospital, but McDonald and Fountain instead drove Davis to the TPD headquarters.  PCS ¶ 29.  McDonald first sat with plaintiff trying to keep him occupied while Fountain went to the hospital to gather more information.  PCS ¶ 30.  Defendant Tim Colaneri was also involved in the investigation, first going to the hospital with an evidence technician to take photographs, and then going to plaintiff's home, where he got a briefing from an officer on scene, assisted in executing a search warrant, and also assisted in canvassing the neighborhood and speaking to witnesses.  PCS ¶ 31.  Fountain, McDonald, and Colaneri then interrogated Davis at the precinct.  PCS ¶ 32.  Colaneri was the primary questioner during the first interrogation of Davis, and he recorded part of the interrogation on his cell phone.  PCS ¶ 33.  Davis provided no incriminating statements during his first conversation with police, and defendants concede probable cause to arrest plaintiff did not exist based on the known information.  PCS ¶ 34.

On February 27, 2015, an autopsy was conducted by defendant Michael Sikirica, the Rensselaer County medical examiner, which was attended by defendants McDonald, Fountain, and Colaneri, evidence technician Anthony Buttofucco, and an Assistant District Attorney (hereinafter "ADA") from the Rensselaer County District Attorney's Office (hereinafter "RCDAO") Andra Ackerman.  PCS ¶ 35.  Law enforcement presence is not necessary for Sikirica to perform an autopsy, law enforcement personnel are not present for all autopsies conducted by Sikirica, but they were present here to feed Sikirica information, including that Davis was the only person home when V.D. died.  PCS ¶¶ 37-39.  Notably, the National Academy of Science recommends that law enforcement and prosecutors should not be present during autopsies because

they may influence the medical examiner.  PCS ¶ 42.  As part of the autopsy, Sikirica ordered tests that were relevant to determining whether V.D. had died of natural causes, but despite that the results of said tests were outstanding, Sikirica informed Fountain that he planned to rule the death a homicide.  PCS ¶ 40.  Sikirica's decision to rule the death a homicide based solely on his discussions with the defendant TPD officers, and on the observed injuries, resulted in Sikirica failing to fully explore potential natural causes of death.  PCS ¶ 41.

On February 27, 2015, Mason and TPD Sergeant Parrow questioned plaintiff and Mr. Parker.  PCS ¶ 43.  On March 1, 2015, ADA Ackerman sent an email to defendants Fountain and Colaneri, copying defendant Abelove, concerning a February 28, 2015, meeting held regarding next steps in investigating Davis and V.D.'s death.  PCS ¶ 44.  On March 2, 2015, Fountain conducted a second video recorded interview of Davis inside an interrogation room at TPD headquarters lasting two hours.  PCS ¶ 45.  McDonald participated in the interview by monitoring the video feed on a computer from a separate room.  PCS ¶ 46.  The March 2, 2015, interview yielded no additional information to support probable cause to arrest Davis, and it was still unknown to the defendants what caused V.D.'s death.  PCS ¶ 47.  On March 12, 2015, defendant Sikirica, defendants Fountain, Colaneri, and Mason, as well as ADA Ackerman, and TPD Detective Sergeant Parrow, attended another meeting to discuss the case.  PCS ¶ 48.  Sometime before or after the meeting, Sikirica received a copy of the March 2, 2015, interrogation video from the TPD defendants, during which Davis demonstrated how he had attempted to perform CPR on V.D.  PCS ¶ 49.

Over the next several months, Fountain and McDonald questioned plaintiff at least two more times while he was out walking and Fountain told him, in sum and substance, that he needed him to tell the truth because his boss was pressuring him to close the case.  PCS ¶ 50.  Fountain

also met with the RCDAO a few times during the investigation and before the final autopsy report

was released.  PCS ¶ 51.  At this point, the only evidence linking Davis to V.D.'s death was that

he was with her when she died, which alone was not sufficient to charge Mr. Davis with murder

or any other crime.  PCS ¶ 52.  Then, on August 14, 2015, defendant Sikirica issued his final

autopsy report determining in relevant part that the manner of V.D.'s death was purportedly a

homicide and that V.D. had died of "[h]ypovolemic shock due to a large hemoperitoneum due to

multiple lacerations of the liver with right rib fractures due to blunt force trauma" and noting a

"[h]istory of decedent reportedly found unresponsive with reported history of attempted

cardiopulmonary resuscitation by a large adult."  PCS ¶ 53.  Without the autopsy findings linking

the death to a large adult, i.e., Davis, there was no probable cause to arrest Davis for V.D.'s death.

PCS ¶ 63.  At the time of these events, Davis was 6' 10" tall and approximately 240 to 250 pounds

and had very big hands.  PCS ¶ 62.

Sikirica made his determination that a large adult had performed CPR after watching the

video of Davis demonstrating CPR and purportedly linking the pattern of injuries observed to be

most consistent with what Davis had demonstrated on the video and had Sikirica not seen the video

he would not have attributed the death to Davis.  PCS ¶¶ 54-55.  Notably, Sikirica failed to note in

his autopsy report that an additional 6,000 compressions were also performed on V.D. by EMS

and hospital staff of various sized hands, despite conceding he was aware that V.D. had undergone

prolonged CPR.  PCS ¶ 56.  Notwithstanding that he was given the supporting depositions of EMS

and medical staff taken by TPD, and that it would have been proper under the circumstances,

Sikirica neither spoke to EMS nor to the emergency room doctors who performed CPR to

determine how CPR was conducted by them prior to issuing his report, but rather just assumed it

was done correctly by them and without compressing the abdomen.  PCS ¶¶ 58-59.  Sikirica's

assumption that CPR was performed correctly was also faulty given that EMS had performed CPR with two hands while V.D. was on a soft futon.  PCS ¶ 60.

Sikirica's autopsy report was notably biased towards Davis without medical basis, given that the size of an individual's hands cannot be medically correlated to the resultant CPR-related injury, as Sikirica apparently did here, based on accepted medical research and knowledge.  PCS ¶ 57.  His determination that V.D.'s death was a homicide despite that he linked the injuries to CPR by Davis was also improper since he concedes that injuries inflicted during the process of resuscitation efforts when a person is already in extremis would not be a homicide.  Sikirica's bias is further underscored by his concession that had he determined that the rib and liver injuries leading to death were from EMS performing CPR, he would not have labeled the death a homicide, but rather would have left the death undetermined or accidental.  PCS ¶¶ 105-106.

After the autopsy was issued, on September 9, 2015, Fountain, along with McDonald, interviewed Davis in the aforementioned interrogation room on video for a third time, during which no new information to support an arrest was learned.  PCS ¶ 65.  At the time of this interview, Fountain believed, based on conversations with Sikirica, that V.D.'s ribs had been fractured and that the ribs had lacerated the liver, causing V.D. to die.  PCS ¶ 66.  According to Sikirica, Fountain's understanding of V.D.'s death was incorrect, and he would not have told him that was the cause of death.  PCS ¶ 67.  On September 29, 2015, RCDAO presented the case against plaintiff to a grand jury.  ECF Doc. 116-8, Defs.' City 56.1 Statement of Material Facts (hereinafter "City 56.1") ¶ 64.  McDonald, along with Fountain, met with a prosecutor, believed to be ADA Ackerman, prior to the grand jury presentation to discuss what would be charged, but did not testify because he was on vacation when the grand jury was convened.  PCS ¶ 68.

During the grand jury presentation, Fountain falsely testified to the grand jury that Davis said it was a normal occurrence for V.D. to wake up tired.  PCS ¶ 69.  Fountain also falsely informed the grand jury that V.D.'s bed was really neat and made up, and not fussed or messed up at all, and therefore inconsistent with someone performing CPR on the bed as Davis claimed he did.  PCS ¶ 70.  He further falsely informed the grand jury that Davis and Parker were not prevented from going to the hospital in the ambulance and that Davis was calm, subdued, even keeled, and not acting like you would think somebody would if they had a two-and-a-half-year-old who wasn't breathing.  PCS ¶¶ 71-72.  To the contrary, on February 26, 2015, Davis was distraught, upset, concerned, sniffling, and crying at times.  PCS ¶ 73.

Sikirica also testified at the grand jury after met with the RCDAO.  PCS ¶ 74.  Sikirica falsely told the grand jury that he had ruled out *any* natural cause of death or other explanation for V.D. to have been unconscious, despite later conceding that it was possible V.D. had died of a natural event and that he could not dispute that V.D. could have been in cardiac arrest before Davis attempted CPR.  PCS ¶ 75.  Further, in his direct testimony presented by RCDAO to the grand jury, Sikirica did not inform the grand jury of his final autopsy finding that he had correlated V.D.'s injuries to a "[h]istory of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult." PCS ¶ 76.  The District Attorney placed into evidence before the grand jury only photos of the lacerated liver and the final death certificate, omitting the final autopsy report which referenced the performance of CPR by a large adult.  PCS ¶ 77.  Only when recalled to the grand jury and pressed by a grand juror did Sikirica concede that the manner in which Davis described doing CPR could cause rib fractures and lacerations to the liver.  PCS ¶ 78.  This concession was exculpatory evidence which was later disclosed by RCDAO pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  PCS ¶ 79.

In addition, Sikirica falsely informed the grand jury that the amount of blood found in V.D.'s abdomen indicated that the fractures and lacerations did not occur during Davis' CPR attempt and that V.D. was alive after the injuries were inflicted because the five squeezes described by Davis would not have amounted to 400 MLs of blood.  PCS ¶ 80.  Sikirica failed to put in his autopsy report or to otherwise inform the grand jury that after Davis' five squeezes, EMS and hospital staff did approximately 6,000 additional compressions which would have contributed to the amount of blood found in V.D.'s abdomen at autopsy.  PCS ¶ 81.  No reasonable pathologist should draw the conclusion that the amount of blood seen on autopsy was present at the time of death because it is known that humans continue to bleed after death with CPR.  PCS ¶ 82.  Moreover, the amount of blood in V.D.'s abdomen at autopsy was consistent with CPR, with the fact that lacerations to the liver continue to bleed.  PCS ¶ 83.  Further, the fact that EMS reported that V.D.'s stomach was not distended upon arrival, also supported that there was additional blood accumulation while CPR was being performed by EMS and hospital staff.  PCS ¶ 84. Sikirica gave additional false testimony, including that when EMS arrived, V.D. was cool to the touch and had some electrical activity in her heart, when in actuality per EMS V.D. was warm to the touch and had no electrical activity.  PCS ¶ 85.  Based on the false fact that V.D. purportedly had electrical activity when EMS responded, V.D.'s injuries had occurred approximately 15 to 20 minutes prior to the arrival of EMS.  PCS ¶ 86.

After hearing the testimony of only Fountain and Sikirica, the grand jury indicted plaintiff. PCS ¶ 87.  Defendant Abelove signed the indictment.  PCS ¶ 88.  After the indictment, an arrest warrant was issued, and plaintiff was arrested on October 2, 2015, and jailed until his acquittal after a jury trial on August 25, 2016.  PCS ¶ 89.  The investigation which led to plaintiff's arrest was a collaborative effort among Sikirica, RCDAO, and the TPD.  PCS ¶ 96.  During the

prosecution, Coonradt testified at a suppression hearing conducted on May 3, 2016, where she reiterated her false claims that plaintiff had informed her that he told V.D. to go back to bed because it was too early, that he woke up at 11:00 a.m., and made a comment that time must be flying.  PCS ¶ 90.  McDonald also testified at the suppression hearing conducted on May 3, 2016, during which he conceded plaintiff was upset, sniffling, and on the verge of tears, and repeatedly expressed that he didn't know what happened.  PCS ¶ 91.

Coonradt testified again at trial and again reiterated her false claims that plaintiff had informed her that he told V.D. to go back to bed because it was too early, that he woke up at 11:00 a.m., and made a comment that time must be flying.  PCS ¶ 92.  Sikirica also testified at trial and, like with the grand jury, during his direct testimony Sikirica did not inform the jury of his final autopsy finding that he had correlated V.D.'s injuries to Davis' attempted CPR with large hands, instead informing the jury it would take the force of a motor vehicle accident or severe blunt force trauma caused by being hit in the abdomen with an object or running into an object for such injuries to the liver to occur.  PCS ¶ 93.  Sikirica also denied at trial that his medical opinion was based on the video which depicted Davis performing CPR despite that he directly referenced information learned from the video in his autopsy report.  PCS ¶ 94.  Fountain testified at the trial as well, although he had retired from TPD after he himself had been indicted by defendant Abelove for corruption.  PCS ¶ 95.  During the trial Sikirica called a meeting with ADA Hall and defendant Abelove to express his frustration and criticism of the trial ADA, Cindy Chavkin.  Davis was acquitted of all charges on August 25, 2016.  PCS ¶ 89.  Abelove conceded after the acquittal that the case against Davis was not strong but stated that he did not regret pursuing it.  PCS ¶ 98.

V.D.'s injuries to her liver and ribs were obviously postmortem, from CPR, and did not contribute to her death.  PCS ¶ 104.  CPR commonly causes lacerations to the liver and fracture

ribs, and these areas of the body are the most likely to be injured during CPR. PCS ¶ 99. Moreover, prolonged CPR, as V.D. underwent, is significantly associated with a higher incident of rib fractures, as is CPR if performed with a hand behind the decedent as Davis did here. PCS ¶ 100. Indeed, the longer CPR is performed, the more CPR-associated injuries will be seen. PCS ¶ 101. That V.D.'s injuries were CPR related, is further supported by the fact that V.D. had no exterior bruising or bruising or injuries to other organs. PCS ¶ 102. All experts also concede the type of compressions Davis demonstrated were consistent with the injuries sustained by V.D. PCS ¶ 103.

## STANDARD OF REVIEW

Summary judgment should be granted only if the Court determines that there is no genuine dispute as to any material fact concerning the non-movant's claims or defenses and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must examine the facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all factual inferences in favor of the non-moving party. *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). The burden is on the moving party to show that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

### POINT I
### PLAINTIFF WAS MALICIOUSLY PROSECUTED[2]

To survive a summary judgment motion on a malicious prosecution claim under § 1983, a plaintiff must "show a seizure or other perversion of proper legal procedures implicating his

---

[2] Given that it is not disputed that plaintiff was arrested after a Grand Jury indictment and therefore after legal process issued, plaintiff agrees that his claim sounds in malicious prosecution, not false arrest. *See e.g., Zanfardino v. City of New York*, 230 F. Supp. 3d 325, 335–36 (S.D.N.Y. 2017). Nonetheless, because the grand jury indictment was procured improperly, the indictment does not preclude his malicious prosecution. *See* Point I(B), *infra*.

personal liberty and privacy interests under the Fourth Amendment . . . that criminal proceedings were initiated or continued against him, with malice and without probable cause, and were terminated in his favor." *See Lanning v. City of Glens Falls*, 908 F.3d 19, 24 (2d Cir. 2018). Under § 1983, a termination is considered favorable if it is indicative of innocence. *Id.* at 27-28. None of the defendants contest that plaintiff was seized and that a not guilty verdict is a favorable termination. Defendants City of Troy, Fountain, McDonald, Colaneri, and Coonradt, (hereinafter "City defendants") further concede that defendant Fountain was personally involved in plaintiff's prosecution. *See* City Defs.' Mem. of Law, pp. 8-10. Instead, the City defendants assert that defendants Coonradt, McDonald, and Colaneri, were not sufficiently involved in initiating the prosecution, that probable cause purportedly existed to arrest plaintiff based on the grand jury indictment, and that plaintiff cannot establish malice. *See* City Defs.' Mem. of Law, pp. 8-13. Defendants County of Rensselaer, Sikirica, and Abelove (hereinafter "County defendants") assert that Sikirica was not the proximate cause of the prosecution, that defendant Abelove was not sufficiently involved in initiating the prosecution, that probable cause purportedly existed to arrest plaintiff, and that plaintiff cannot establish malice. *See* County Defs.' Mem. of Law, pp. 5-13. For the reasons argued herein both the City and County's arguments fail.

### A.    Coonradt, McDonald, Colaneri, Sikirica, and Abelove all Participated in the Initiation of the Prosecution

There are triable issues of fact as to whether Coonradt, McDonald, Colaneri, Sikirica, and Abelove aided in the initiation of a malicious prosecution against plaintiff. "[C]ourts have found triable issues of fact as to the initiation element where a defendant police officer 'brought formal charges and had the person arraigned, filled out complaining and corroborating affidavits, swore to and signed a felony complaint, or created false information and forwarded it to prosecutors.'" *See Wong v. Yoo*, 649 F. Supp. 2d 34, 65 (E.D.N.Y. 2009). A defendant can be found to have

initiated a prosecution "by creating material, false information and forwarding that information to a prosecutor." *See Aguirre v. City of New York*, No. 15 Civ. 6043 (PKC), 2017 WL 4236552, at *9 (E.D.N.Y. Sept. 22, 2017) (quoting *Costello v. Milano*, 20 F.Supp.3d 406, 415 (S.D.N.Y. 2014); *See also*, *Cameron v. City of New York*, 598 F.3d 50, 64 (2d Cir. 2010) (citing *Llerando–Phipps v. City of New York,* 390 F.Supp.2d 372, 383 (S.D.N.Y.2005)) (recognizing that "[A] police officer who fabricated evidence and forwarded that evidence to a prosecutor (who used it against a defendant) would [be] liable for the consequences of his misconduct. . . ."); *Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999) ("Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution.")  Further, a police officer need not have completed the arrest paperwork or spoken to prosecutors to be to be held responsible for malicious prosecution, so long as his actions caused the initiation of criminal process against the plaintiff. *See Phelps v. City of New York*, No. 04 Civ. 8570 (DLC), 2006 WL 1749528, at *4 (S.D.N.Y. June 27, 2006).

### i.    Coonradt, McDonald, And Colaneri Aided in The Initiation of The Prosecution

Here, accepting plaintiff's allegations as true, defendants Coonradt, McDonald, and Colaneri took actions alongside Fountain which a rational jury could find caused the initiation of criminal process against plaintiff, particularly considering paucity of evidence to support the prosecution in the first instance.   Given that defendant Abelove recognized and publicly commented that the case against Davis was not strong, each inculpatory falsehood proffered by defendants had greater significance here.  PCS ¶ 98.  For example, while it is true that Coonradt was not present for the autopsy and did not testify in the grand jury, she did prepare a report which was provided to RCDAO in which she falsely recorded that Davis had tried to wake V.D. up at

11:00 a.m. and in response to her informing Davis that it was 1:30 p.m., claimed Davis stated time must be flying.  PCS ¶ 26.  According to plaintiff, the statements Coonradt attributed to him in her report are false and he consistently told defendants he was unsure of what time he woke up because he did not have access to a clock.  PCS ¶ 17.

The false facts recorded in Coonradt's report, which were provided to the prosecution and were later the subject of a suppression hearing at which Coonradt testified, and testified to again at trial, created an inference that there was two hours of essentially "lost time" between when plaintiff woke up and when he called police at 1:09 p.m.  PCS ¶¶ 26-27, 90, 92.  A reasonable juror could find that this manufactured gap in time, which also created a gap in plaintiff's story, and which was forwarded to prosecutors, contributed to the initiation of the prosecution against plaintiff, rendering Coonradt personally involved.  In addition, Coonradt falsely conveyed to prosecutors and testified at the suppression hearing and at trial that plaintiff told her he put V.D. back to bed because he was tired, whereas plaintiff has consistently maintained he put V.D. back to bed because V.D. appeared abnormally tired and sluggish.  PCS ¶¶ 90, 92.  This false claim is likewise significant given that V.D.'s health on the date in question was of key importance.  Given that Davis has alleged that Coonradt provided misleading information and reports to RCDAO which were likely to influence the decision to prosecute, and that these claims are in dispute, summary judgment as to Coonradt should be denied.  *See Llerando-Phipps*, 390 F. Supp. 2d at 382–83 (denying summary judgment where the plaintiff's allegations of misleading actions by defendant officers were in dispute).

With respect to McDonald, he was assigned as the primary investigator along with Fountain.  PCS ¶ 28.  Further, McDonald and Colaneri were both directly involved in nearly every step of the investigation that ultimately led to Sikirica determining V.D.'s death was a purported

homicide based on viewing the interrogation video of plaintiff demonstrating how he performed CPR, and to plaintiff's indictment.  PCS ¶¶ 28, 30-33, 35, 45-48, 65.  Further, McDonald met with prosecutors to prepare for the grand jury presentation and apparently did not testify only because he was on vacation.  PCS ¶ 68.  Where all three defendants were directly involved in the investigation, including, *inter alia*, questioning plaintiff, speaking to witnesses, attending the autopsy, and meeting with Sikirica and the RCDAO, the mere fact that Fountain was the investigator tasked with testifying at the grand jury regarding the case should not render McDonald and Colaneri immune from liability.   *See Aguirre*, 2017 WL 4236552, at *9 (citing *Ross v. Township of Woodbridge*, No. 09-cv-1533, 2010 WL 1076275, at *4 (D.N.J. Mar. 23, 2010) (denying summary judgment as to malicious prosecution claim where defendant officer completed an arrest report, even though he did not fill out the complaint or testify at a grand jury proceeding or before a judge in any proceeding related to plaintiff's criminal case).  Further, defendants have cited to no authority to support the proposition that only officers who testify in the grand jury can be liable for initiating a malicious prosecution.

Whether or not these officers' conduct was sufficient to be said to have contributed to the initiation of the prosecution is a question that should resolved by a jury.  *See Noga v. City of Schenectady Police Officers*, 169 F. Supp. 2d 83, 90 (N.D.N.Y. 2001).  Finally, at a minimum, McDonald and Colaneri could be found liable for failing to intervene in the prosecution, given that accepting plaintiff's facts as true they were aware that the evidence supported his innocence, yet they allowed the prosecution to proceed.  *See id*. at 88-89.

### ii.    Sikirica And Abelove Were Also Involved in Initiating the Prosecution

Defendant Sikirica asserts that he was not the proximate cause of the prosecution initiated against plaintiff.  *See* County Defs.' Mem. of Law, pp. 11-12.  The Second Circuit has "explained

that 'foreseeability and causation . . . are issues generally and more suitably entrusted to fact finder adjudication.'" *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007). Moreover, a "proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury." *Hamilton v. City of New York*, No. 15 CV 4574 (CBA)(SJB), 2019 WL 1452013, at *17 (E.D.N.Y. Mar. 19, 2019) (quoting *Hydro Inv'rs. Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000). The Second Circuit also suggested in *Higazy* that "[e]ven if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty." *Hamilton*, 2019 WL 1452013, at *17.

Here, Sikirica conceded that he could foresee that his decision to label V.D.'s death a homicide would lead to the decision to prosecute plaintiff. Moreover, the TPD defendants concede that without Sikirica's report linking the death to Davis, there would not have been purported probable cause to pursue a prosecution against Davis. PCS ¶ 64. There also can be no question that Sikirica provided his autopsy report to prosecutors, and that his report correlated V.D.'s injuries specifically to Davis, despite there being no medical basis to correlate the injuries to Davis' large hands, rather than the many different sized hands of medical personnel who performed CPR after him. PCS ¶¶ 53, 56-57. Further, Sikirica communicated with the RCDAO, and provided a number of false facts to that office which were then presented to the grand jury, including *inter alia*, that he had ruled out any possible natural cause of death, and that five CPR compressions could not account for the amount of blood in V.D.'s abdomen, despite later conceding that it was possible V.D. died of natural causes and that ongoing CPR, as occurred here, contributes to

17

additional significant blood accumulation in the abdomen. PCS ¶¶ 74-75, 80-84.  Moreover, the omission of the number of compressions and that CPR was prolonged was, contrary to defendants' claim, medically significant, because prolonged CPR—here approximately 6,000 compressions over the span of an hour—is likely to cause more significant CPR-related injuries and more blood in the abdominal cavity as was seen in the case of V.D.  *See id.*; Cty. Defs.' Mem. of Law p. 11.

In sum, Sikirica's discounting of V.D.'s recent health and behavior the morning of her death, medically unsound linking of V.D.'s injuries to Davis' "large hands," and false and misleading medical claims about how much blood would accumulate from five compressions by Davis, when his compressions were followed by 6,000 more, all of which was conveyed to RCDAO, could all be found by a reasonable jury to have contributed to RCDAO's decision to pursue charges and the initiation of the prosecution.

Defendant Abelove asserts that plaintiff's claim against him should be dismissed because he was not personally involved in plaintiff's prosecution.  *See* County Defs.' Mem. of Law, pp. 12-13.  However, a rational juror could reject Abelove's claimed lack of involvement in the investigation that led to plaintiff's prosecution, based on facts including Abelove's role as the senior most official in the RCDAO at the time, that Abelove was cc'ed on an initial e-mail regarding the investigation, and then later signed the indictment, was involved in a mid-trial meeting with Sikirica who was complaining about the assigned ADA, and commented after trial that he was aware the case was not strong, but did not regret pursuing the prosecution.  PCS ¶¶ 36, 44, 88, 97-98.  Nonetheless, because plaintiff has withdrawn his false arrest claim, and because prevailing law holds that Abelove is absolutely immune for his role in maliciously prosecuting plaintiff, plaintiff does not contest Abelove's dismissal from the action.  *See e.g., Shmueli v. City of New York*, 424 F.3d 231, 236–38 (2d Cir. 2005).

18

**B.      Probable Cause to Prosecute Plaintiff Was Lacking**

Defendants next argue that plaintiff's malicious prosecution claim fails because the grand jury indictment created a presumption of probable cause.  *See* City Defs.' Mem. of Law, pp. 10-13; County Defs.' Mem. of Law, pp. 5-11.  "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York."  *Sanders v. City of New York*, No. 12 CV 113 (PKC)(LB), 2015 WL 1469514, at *14 (E.D.N.Y. Jan. 7, 2015).  An "indictment by a grand jury creates a presumption of probable cause."  *Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010).  The presumption, however, may be rebutted "by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"  *Id.*  "Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome.  *Id.* (quoting *Boyd v. City of New York,* 336 F.3d 72, 77 (2d Cir.2003)).  There also "may be extraordinary cases in which the discrepancies between the evidence possessed by the authorities and the evidence presented 'are so substantive that failure to disclose them would be comparable to fraud or perjury.'"  *See Marshall v. Sullivan*, 105 F.3d 47, 54–55 (2d Cir. 1996)

Here, RCDAO, after a pre-indictment investigation which revealed only evidence that corroborated Davis' explanation of events and that V.D.'s injuries were CPR related, presented extremely limited evidence to the grand jury through only two witnesses, defendants Fountain and Sikirica, which appeared to intentionally omit references to the fact that V.D.'s injuries were consistent with Davis performing CPR and to the fact that V.D. underwent prolonged CPR.  PCS ¶¶ 10, 34, 53-54.  City 56.1 ¶¶ 65-66.  This limited evidence was bolstered by false and misleading

testimony offered to the grand jury by defendants Fountain and Sikirica which tended to support the inference that Davis had lied about finding V.D. unresponsive and that V.D. could not have died of natural causes.  PCS ¶¶ 69-86.  These false facts include Fountain's testimony to the grand jury that Davis said it was a normal occurrence for V.D. to wake up tired, that V.D.'s bed was really neat and made up, and not fussed or messed up at all, and therefore inconsistent with someone performing CPR on the bed as Davis claimed he did, that Davis and Parker were not prevented from going in the ambulance to the hospital, and that Davis was calm, subdued, even keeled, and not acting like you would think somebody would if they had found a two-and-a-half-year-old who wasn't breathing.  PCS ¶¶ 69-73

Taken together, this false testimony made it seem that V.D. was her normal self on the day in question, had not been in bed when Davis found her as he claimed, and made Davis appear emotionally unconcerned, including choosing not to go to the hospital with V.D.  To the contrary, both Davis and Parker informed police that V.D. was abnormally tired and sluggish, which was the reason Davis told her to go back to bed.  PCS ¶ 8.  Further, a photo of the bed, which was not placed in evidence for the grand jury to see, shows that the blanket on V.D.'s bed was not perfectly neat, and contrary to Fountain's claim, Davis was distraught, upset, concerned, sniffling, and crying at times in Fountain's presence on the date in question, and both Davis and Parker confirmed that they were not permitted to go to the hospital with V.D.  Klein Decl. Ex. 9; Ex. 29; PCS ¶¶ 19, 71-73.  It should also be emphasized that defendant Fountain did not even properly understand V.D.'s injuries at the time he aided in procuring an indictment, believing wrongly that V.D.'s broken ribs had lacerated her liver.  PCS ¶¶ 66-67.

These falsities espoused by Fountain were bolstered by Sikirica's false testimony that he had ruled out *any* natural cause of death or other explanation for V.D. to have been unconscious

before Davis began CPR, despite later conceding that it was possible V.D. had died of a natural event and that he could not dispute that V.D. could have been unresponsive and in cardiac arrest before Davis attempted CPR.  PCS ¶¶ 75, 105.  Further, in his direct testimony to the grand jury, Sikirica did not inform the grand jury of his final autopsy finding that he had correlated V.D.'s injuries to Davis' description of how he attempted CPR, and the RCDAO placed into evidence before the grand jury only photos of the lacerated liver and the final death certificate, omitting the final autopsy report which referenced attempted CPR by a large adult.  PCS ¶¶ 76-77.  Only when recalled to the grand jury and pressed by a grand juror did Sikirica concede that the manner Davis described doing CPR could cause rib fractures and lacerations to the liver.  PCS ¶ 78.  Even this testimony falls short of Sikirica's later sworn testimony that he had linked V.D.'s pattern of injuries to be most consistent with what Davis had demonstrated on the video.  PCS ¶ 54.  From this it can be inferred that in his effort to aid in the malicious prosecution of Davis, Sikirica intentionally offered misleading testimony and withheld evidence which would have supported Davis' innocence.

Sikirica also falsely informed the grand jury that the amount of blood found in V.D.'s abdomen indicated that the liver lacerations did not occur during Davis' CPR attempt and that V.D. was alive after the injuries were sustained because the five squeezes described by Davis would not have amounted to 400 MLs of blood.  PCS ¶ 80.  Sikirica, however, failed to inform the grand jury or put in his autopsy report that after Davis' five squeezes, EMS and ER doctors did approximately 6,000 additional compressions over the span of an hour, despite that he concedes that these compressions would have contributed to the amount of blood found in V.D.'s abdomen at autopsy, and that humans continue to bleed after death with CPR.  PCS ¶ 81.  Indeed, as both Davis' trial expert and plaintiff's expert here, Dr. Katherine Maloney, confirmed, no pathologist

should draw the conclusion that the amount of blood seen on autopsy was present at the time of death because it is known that humans, in general, and liver lacerations, specifically, continue to bleed after death, particularly with ongoing CPR.  PCS ¶¶ 82-84.  Furthermore, to the extent Sikirica claims his testimony regarding the extensiveness of the lacerations being inconsistent with CPR was supported by medical literature generally, this should not be credited insofar as defendants rely on only one article, which was never provided in discovery and which purportedly, involved only 400 subjects, and Sikirica never claimed that the article ruled out the possibility of more extensive lacerations.  *See* County 56.1 ¶ 98.  Moreover, both Davis' trial expert and Dr. Maloney have observed similarly extensive lacerations and confirmed that the lacerations were consistent with prolonged CPR.  Klein Decl. Ex. 6, Trial Tr. VI 43:8-44:3, 63:12-64:15.  Maloney Decl. ¶ 8.  Finally, Sikirica also falsely informed the grand jury that when EMS arrived, V.D. was cool to the touch and had some electrical activity in her heart, when in fact V.D. was warm to the touch and had no electrical activity.  PCS ¶¶ 15, 21, 85.  Sikirica went on to opine that based on the false fact that V.D. purportedly had electrical activity when EMS responded, V.D.'s injuries had occurred approximately 15 to 20 minutes prior to the arrival of EMS.  PCS ¶ 86.  This testimony was based on a false premise and was misleading.

In sum, Sikirica and Fountain's testimony was peppered with false information that had been conveyed to RCDAO which tended to support that V.D. was her normal self on the morning of her death, that a death from natural causes was impossible, and that was further inconsistent with Sikirica's initial autopsy report which directly correlated the history of CPR by a large adult, i.e., Davis, with the injuries he observed to V.D.  Without this evidence, and had the grand jury been given access to or made aware of the full content of the autopsy report, a reasonable jury could conclude that the grand jury might have declined to indict plaintiff on the basis that the grand

jurors themselves zeroed in on that V.D.'s injuries were CPR related, despite defendants' efforts to avoid such a conclusion because it supported Davis' innocence. This is underscored by the fact that Sikirica's testimony, which was only elicited based on insightful questions by grand jurors, was later turned over to the defense by the RCDAO as *Brady* material. PCS ¶ 79. Where, as here, a reasonable jury could conclude that facts supporting that V.D.'s injuries were sustained during CPR after V.D. was already unresponsive after being unwell in the morning were withheld from the grand jury, and that false testimony was presented to "deliberately misled the grand jury to believe that a crime had been committed," the decision to indict plaintiff "could reasonably be found to have been the result of conduct comparable to fraud or perjury." *See Marshall*, 105 F.3d at 55. If a jury so found, then the presumption of probable cause from the indictment would be rebutted, and therefore a question of fact exists as to whether there was probable cause to prosecute plaintiff.

### C.    Questions of Fact Exist as To Whether Defendants Acted with Malice

The City and County defendants further argue that plaintiff has not presented facts in support of his claim that defendants acted with malice. *See* City Defs.' Mem. of Law, p. 13; County Defs.' Mem. of Law, p. 12. Because a lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment, defendants' argument fails in this regard. *See e.g., Rentas v. Ruffin*, 816 F.3d 214, 221-22 (2d Cir. 2016); *Boyd*, 336 F.3d at 78 ("Once we find an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well."). *See also*, *Sanders*, 2015 WL 1469514, at 16 (collecting cases); *Anderson v. City of New York*, 817 F.Supp.2d 77, 91 (E.D.N.Y. 2011). Thus, because plaintiff has raised a question of fact regarding probable cause as argued at Points I(B), *supra*, plaintiff has consequently also raised a question of fact as to malice sufficient to withstand summary judgment. S*ee Deskovic*

*v. City of Peekskill*, 894 F. Supp. 2d 443, 461 (S.D.N.Y. 2012)*; Boyd,* 336 F.3d at 78; *Brandon v. City of New York*, 705 F. Supp. 2d 261, 274 (S.D.N.Y. 2010) ("once an issue of fact exists with regard to the possible lack of probable cause, the element of malice becomes an issue of fact as well.") Moreover, a jury could also infer malice from defendants' falsification of evidence. *See Crews v. County of Nassau*, 996 F. Supp. 2d 186, 208 (E.D.N.Y. 2014); *see also*, *Buari v. City of New York*, 530 F.Supp.3d 356, 385 (S.D.N.Y. 2021) (recognizing that "[f]alsifying evidence is sufficient to show malice."). Malice can also be inferred from the defendants' "apparently myopic focus" on Davis to the exclusion of all other explanations for V.D.'s death. *See Manganiello*, 612 F.3d at 164.

In sum, for the reasons stated above, because a rational jury could conclude that Fountain, McDonald, Colaneri, Coonradt, and Sikirica were personally involved in initiating the prosecution against plaintiff, that the grand jury indictment was procured based on false and misleading evidence, and that defendants acted with malice, and because there is no dispute that plaintiff was deprived of his liberty and that the prosecution was favorably terminated, plaintiff's federal malicious prosecution should be permitted to proceed to trial.

### D.  Plaintiff's State Law Malicious Prosecution Claim Should Also Proceed to Trial

Federal and state malicious prosecution claims are largely overlapping, except that with respect to the favorable termination element under state law, plaintiff must meet a lower standard, demonstrating that the reasons for dismissal were not inconsistent with innocence. *See Lanning*, 908 F.3d at 25-27.  Further, defendant Rensselaer County and City of Troy may be held liable under state law for plaintiff's malicious prosecution under a theory of *respondeat superior*.  *See Bailey v. City of New York*, 79 F. Supp. 3d 424, 451 (E.D.N.Y. 2015).

Here, because plaintiff has met all the elements of his federal claim, he has also satisfied the elements necessary for his state law claim to proceed as well. *Buari*, 530 F.Supp.3d at 384 (citing *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 71-73 (S.D.N.Y. 2020)).  Moreover, because plaintiff has alleged sufficient involvement of County and City defendants, including Sikirica and prosecutors with the RCDAO in the investigation leading to the initiation of the malicious prosecution, and in the presentation of misleading evidence to the grand jury, including withholding the autopsy evidence that supported that V.D.'s death was an accident and non-criminal even under Sikirica's version, and a result of a CPR related injury, he has alleged sufficient facts to hold the County and City liable for malicious prosecution. *See Kirchner v. Cty. of Niagara*, 107 A.D.3d 1620, 1621–22 (2013).  Moreover, even if, *arguendo,* it were to be determined that any of the defendants were entitled to either absolute or qualified immunity, which they are not under state law because they were engaged in investigative functions and, accepting plaintiff's allegations as true, their actions were taken in bad faith and without a reasonable basis, this would still not defeat liability as to the County or City because New York law does not bar a principal's vicarious liability, even when an agent is individually immune. *Triolo v. Nassau Cty.*, 24 F.4th 98, 111 (2d Cir. 2022); *Kirchner*, 107 A.D.3d at 1624.

## POINT II
### DEFENDANTS DENIED PLAINTIFF HIS RIGHT TO A FAIR TRIAL

"A plaintiff establishes a denial of the right to fair trial claim by showing that the defendant fabricated evidence that was likely to influence a jury, forwarded that information to prosecutors, and that the plaintiff suffered a deprivation of liberty as a result." *Garnett v. City of New York*, 13 CV 7083 (GHW), 2014 WL 3950904, *12 (S.D.N.Y. Aug. 13, 2014) (citing *Ricciuti,* 124 F.3d at 129-130); *see also, Struthers v. City of New York*, No. 12 CV 0242 (JG), 2013 WL 2390721, *13

(E.D.N.Y. May 31, 2013).  The existence of probable cause is not a defense.  *Ricciuti v. N.Y.C. Transit Athy.*, 124 F.3d 123, 130 (2d. Cir. 1997).

The City defendants argue that plaintiff's right to fair trial claim should be dismissed based on a faulty premise that plaintiff does not allege that any of the City defendants fabricated evidence.  *See* City Defs.' Mem. of Law, pp. 14-15.  To the contrary, and as discussed above, plaintiff alleges that Coonradt and Fountain fabricated evidence which was forwarded to RCDAO and utilized during the grand jury presentation and/or later testimony during hearings and trial.  These false facts included, *inter alia*, Fountain's claims that Davis said it was a normal occurrence for V.D. to wake up tired; that Davis and Parker were not prevented from going to the hospital in the ambulance; and that Davis was calm, subdued, even keeled, and not acting like you would think somebody would if they had a two-and-a-half-year-old who wasn't breathing; and Coonradt's claims that Davis told her that he tried to wake V.D. up at 11:00 a.m. and that he put V.D. back to bed because he was tired.  PCS ¶¶ 26-27, 69, 71-72.

Further, this evidence was likely to influence a jury insofar as it served to undermine Davis' consistent explanation of the incident and his claim that V.D. seemed unwell in the morning, was unresponsive when he found her at an unknown time before attempting CPR and then going in search for a phone and reaching 911 at approximately 1:09 p.m.  PCS ¶¶ 2, 8-14, 27.  Based on the foregoing, there are material questions of fact as to whether Fountain and Coonradt fabricated evidence likely to influence a jury which they forwarded to RCDAO.  Finally, there can be no question that Davis suffered a deprivation of liberty, insofar as he was held in jail throughout his prosecution, which lasted from October 2, 2015, through his acquittal on August 25, 2016.  PCS ¶ 89.  Based on the foregoing, plaintiff's denial of his right to fair trial claim should be permitted to proceed to trial as to Fountain and Coonradt.

The County defendants offer no specific argument as to why plaintiff's right to fair trial claim should be dismissed as to Sikirica and for this reason alone the claim should be tried before a jury.  Moreover, to the extent the County defendants' brief could be read to argue that the purported existence of probable cause defeats plaintiff's right to fair trial claim, this argument must be rejected.  *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 278 (2d Cir. 2016) ("probable cause is no defense to a denial of the right to a fair trial claim").  Regardless, because questions of fact exist as to whether Sikirica fabricated evidence which he forwarded to RCDAO, and which was utilized in testimony to the grand jury and at trial.  Two primary fabrications were (1) That Sikirica had ruled out *any* natural cause of death or other explanation for V.D. to have been unconscious before Davis began CPR, despite later conceding that it was possible V.D. had died of a natural event and that he could not dispute that V.D. could have been unresponsive and in cardiac arrest before Davis attempted CPR; and (2) that the amount of blood found in V.D.'s abdomen indicated that the fractures and lacerations did not occur during Davis' CPR attempt, and that V.D. was alive after the injuries because the five squeezes described by Davis would not have amounted to 400 MLs of blood.  PCS ¶¶ 75, 80.  This conclusion was without merit, however, because Sikirica concedes that the additional 6,000 compressions by EMS and hospital staff would have contributed to the amount of blood found in V.D.'s abdomen at autopsy, as well as the fact that humans continue to bleed after death.  PCS ¶¶ 81-83.

Moreover, Sikirica's initial linking of V.D.'s death to compressions by "large hands," while excluding the fact that many other sized hands had also performed CPR, and despite there being no medical basis to make this assumption, was baseless and misleading evidence which was conveyed to the RCDAO and key to the city defendants' linking V.D.'s death to Davis.  PCS ¶¶ 53, 56-57, 63.  Indeed, the city defendants confirmed that without this link, they did not have

probable cause to arrest Davis.  PCS ¶ 63.  Sikirica's later efforts to then distance himself from this initial determination to support a theory that V.D.'s injuries were caused by something other than Davis' CPR attempt, as this would have been admittedly exculpatory, also creates a material question of fact as to whether Sikirica actively participated in the denial of plaintiff's right to fair trial by consistently offering false and misleading evidence in support of the prosecution.

**POINT III**
**REASONABLE    INFERENCES    SUPPORT**
**PLAINTIFF'S CONSPIRACY CLAIM**[3]

"A Section 1983 conspiracy claim requires '(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *Deskovic*, 894 F. Supp. 2d at 465 (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)).  "To survive a motion for summary judgment, plaintiff's evidence of a Section 1983 conspiracy 'must, at least, reasonably lead to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.'" *Stein v. Janos*, 269 F. Supp. 2d 256, 261–62 (S.D.N.Y. 2003) (citing *Hinkle v. City of Clarksburg,* 81 F.3d 416, 421 (4th Cir. 1996)).  Markedly, "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Id*.

Both the City and County defendants first contend plaintiff's conspiracy claim should be dismissed because he purportedly failed to establish a question of fact as to whether his constitutional rights were violated.  *See* City Defs.' Mem. of Law, p. 17; County Defs.' Mem. of Law, p. 20.  To the contrary, as set forth *supra* at Points I and II, plaintiff has established questions of fact regarding his claims for malicious prosecution and right to fair trial.  Further, accepting

---

[3] Plaintiff confirms his withdrawal of his conspiracy claim under § 1985 and asserts his claim only under § 1983.

plaintiff's allegations as true, a jury could conclude that the city defendants and defendant Sikirica conspired to positively or tacitly come to a mutual understanding to accomplish a common and unlawful plan of prosecuting plaintiff for V.D.'s death, despite lacking probable cause to do so. In support of this, plaintiff can cite to the meetings at which defendants Fountain, McDonald, Colaneri, and Sikirica were present and to the apparent, at least tacit agreement, to label V.D.'s death a homicide, despite that defendant Sikirica's own initial findings; and all the evidence collected by the City defendants, supported Davis' explanation of events, including that V.D.'s injuries were consistent with the CPR attempt described by Davis after she was already unresponsive, and by the many individuals who performed CPR after him.  PCS ¶¶ 10, 53-54.

That such an agreement was reached is supported by the fact that after Fountain informed Sikirica that Davis was the only individual with V.D. at the time of her death, and after defendant Sikirica reviewed the footage of the interrogation of Davis, he issued his autopsy report which, without any medical basis, specifically correlated V.D.'s injuries to Davis' CPR attempt with large hands, while omitting any reference to the many other individuals who did CPR.  PCS ¶¶ 39, 49, 53-57.  This link was the basis for probable cause.  PCS ¶ 63.  Defendants thereafter, in an effort to secure an indictment and conviction, collectively tried to skew the evidence away from Sikirica's initial finding that V.D.'s injuries were due to a large adult's *attempted* CPR, by submitting false and misleading evidence to the grand jury that tended to undermine Davis explanation of the day's events, and by withholding Sikirica's finding and autopsy report from the grand jury.  PCS ¶¶ 68-81.  This collective effort to ensure that the medical evidence was congruent with defendants' evolving homicide theory supports a finding that defendants engaged in a conspiracy to maliciously prosecute plaintiff and to deny him his right to fair trial.

Moreover, that this plan was unlawful is underscored by defendant Sikirica's admission that if V.D.'s injuries were due to a failed CPR attempt after V.D. was unconscious, this would not be a homicide, and by RCDAO's turning over Sikirica's testimony, which was importantly elicited by a grand juror, and not offered during Sikirica's direct testimony, that V.D.'s injuries were consistent with Davis' description of CPR as *Brady* material.  PCS ¶¶ 79, 106.  Further, Sikirica's willingness to tailor his testimony away from his initial exculpatory findings and Sikirica's meeting with defendant Abelove and ADA Hall is further evidence that Sikirica was not merely a neutral party presenting witness testimony, but that he was actively working to accomplish the unlawful plan of linking Davis to V.D.'s death to the unreasonable exclusion of the medical evidence supporting that V.D. died of a natural event prior to CPR.  PCS ¶ 97.  With respect to law enforcement attendance at the autopsy and subsequent meetings, this is relevant because it shows an opportunity for the parties to collude and come to a tacit agreement that V.D.'s death would be linked to Davis, not because the meetings themselves are inherently improper.  It is also worth emphasizing that this is not the first time that Sikirica and TPD officers have engaged in efforts to forge a congruence between medical and police evidence in support of the wrongful prosecution of an innocent man.  *See People v. Thomas*, 22 N.Y.3d 629, 646 (2014).[4]  PCS ¶¶ 109-111.  As discussed further, *infra*, at Point V, defendants have engaged in a pattern of such collusive activity.

In sum, viewing the evidence in a light most favorable to plaintiff, a question of fact exists as to whether the City and County defendants conspired to ensure Davis was tried and convicted for V.D.'s death to the unreasonable exclusion of evidence that V.D. had died of natural causes, and therefore summary judgment should be denied.  *See Randle v. Alexander*, 170 F. Supp. 3d

---

[4] The Court is respectfully referred to the record in *Thomas v. Mason, et al*, 17 CV 626 (DJS), in further support of this contention.

580, 592 (S.D.N.Y. 2016) (denying summary judgment because "[c]onstruing the evidence in the

light most favorable to [plaintiff] and drawing all inferences in his favor" the court concluded that

there was "sufficient circumstantial evidence to create a genuine dispute as to whether" the

defendants had conspired.)

**POINT IV**
**FAILURE    TO    INTERVENE    SHOULD**
**PROCEED TO TRIAL**

"It is well settled that 'all law enforcement officials have an affirmative duty to intervene

to protect the constitutional rights of citizens from infringement by other law enforcement officers

in their presence.'"  *Coggins v. County of Nassau*, 988 F.Supp.2d 231, 245 (E.D.N.Y. 2013)

(quoting *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994)).  An officer may be held liable for

failure to intervene if "(1) the officer had a realistic opportunity to intervene and prevent the harm;

(2) a reasonable person in the officer's position would know that the victim's constitutional rights

were being violated; and (3) the officer does not take reasonable steps to intervene."  *See Decayette*

*v. Goord*, No. 06 CV 0783, 2009 WL 1606753, *8 (N.D.N.Y. 2009).  "Whether an officer can be

held liable on a failure to intervene theory is generally a question of fact for the jury to decide."

*See id.* (citing *Anderson,* 17 F.3d at 557).  A duty to intervene to prevent the continuation of the

constitutional violation resulting from a false arrest continues after the arrest.  *See Coggins*, 988

F.Supp.2d at 245.  A failure to intervene claim against an officer can be pled in the alternative.

*See Buchy v. City of White Plains*, No. 14 CV 1806 (VB), 2015 WL 8207492, at *3 (S.D.N.Y.

Dec. 7, 2015); Fed. R. Civ. P. 8(d)(2), (3).

Here, plaintiff's third amended complaint permissibly pled failure to intervene in the

alternative to his other claims. *See Buchy*, 2015 WL 8207492, at *3. Further, viewing the facts in

a light most favorable to plaintiff, for the reasons argued at Points I and II, *supra*, a jury could

31

reasonably conclude that plaintiff suffered an underlying constitutional violation.   Finally, although a reasonable jury could conclude Fountain, Coonradt, McDonald, and Colaneri, were all directly involved in maliciously prosecuting plaintiff, even if, *arguendo,* the jury were to conclude that defendants McDonald and Colaneri were not so involved, a reasonable jury could alternatively hold said defendants liable for failing to intervene if the jury credited that McDonald and Colaneri were aware from their direct involvement in the investigation that all the available evidence supported that V.D.'s injuries were caused by CPR and therefore postmortem, yet did nothing to intervene.  *See Coggins*, 988 F.Supp.2d at 245.  If a jury were to determine based on the foregoing, that said defendants were aware of the baseless nature of the prosecution, yet took no action, the jury could also find that they failed in their duty to intervene.  *Id.*

### POINT V
### THE  CITY  DEFENDANTS  AND  SIKIRICA
### ARE NOT ENTITLED TO IMMUNITY

The County defendants argue that they are entitled to absolute or qualified immunity, whereas the city defendants argue they are entitled to qualified immunity.  *See* City Defs.' Mem. of Law, pp. 21-22; County Defs.' Mem. of Law pp. 14-17.  While plaintiff concedes that under prevailing case law Abelove is immune from suit for his prosecutorial actions, all other arguments advanced by the defendants should be rejected.

### A.      Defendant Sikirica Is Not Entitled to Absolute Immunity

"The Supreme Court has been 'quite sparing' in its recognition of absolute immunity, because '[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.'"  *Newton v. City of New York*, 738 F.Supp.2d 397, 404-05 (S.D.N.Y. 2010).  In determining whether a public official is entitled to absolute immunity, "the Court applies a 'functional approach' and looks to the function being performed

rather than to the office or identity of the defendant." *See Ying Li v. City of New York*, 246 F.Supp.3d 578, 643-45 (E.D.N.Y. 2017). "The key determination in granting absolute immunity is whether the defendant's function is investigative or prosecutorial. *Davis-Guider v. City of Troy*, No. 117 CV1 290 (FJS)(DJS), 2019 WL 1101278, at *10 (N.D.N.Y. Mar. 8, 2019) (citing *Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir. 1995)). Further, ["f]ederal courts have held that absolute immunity on a § 1983 claim is "only available where the defendant can show that his or her function is so sensitive as to require a total shield from liability, and that absolute immunity is essential if that function is to be properly performed." *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 299 (N.D.N.Y. 2018), *on reconsideration sub nom. Thomas v. Mason*, No. 1:17-CV-626 (DJS), 2019 WL 6111572 (N.D.N.Y. Nov. 18, 2019).

Here, Sikirica's function in performing an autopsy pre-arrest and pre-indictment to determine the cause of V.D.'s death was more analogous to a police officer investigating a homicide than prosecutorial in nature. Moreover, as detailed above, accepting plaintiff's allegations as true, Sikirica falsified and withheld evidence in an effort to aid the baseless prosecution of plaintiff. As other jurisdictions have held, Sikirica is therefore entitled to qualified not absolute immunity for such conduct. *See Brewer v. Hayne*, No. 13 Civ. 898 (HTW)(LRA), 2015 WL 13544751, at *12 (S.D. Miss. Apr. 16, 2015), *aff'd*, 860 F.3d 819 (5th Cir. 2017) (holding that a doctor's autopsy was a pre-trial investigative act which was entitled to qualified immunity)*; Kompare v. Stein*, 801 F.2d 883, 887 (7th Cir. 1986) ("The medical examiner's function in performing an autopsy is analogous to that of a police officer investigating a suspected homicide. Therefore, coroners enjoy the same qualified immunity as police officers or other investigators for the state prosecutor."); *Lawyer v. Kernodle*, 721 F.2d 632, 635–36 (8th Cir. 1983) (same); *see also, Elfers v. Varnau*, 101 F. Supp. 3d 753, 760 (S.D. Ohio 2015) ("the doctrine of absolute immunity

offers 'no protection to pretrial conduct, including the fabrication of evidence later adopted in trial testimony; that receives only qualified-immunity protection.'").

### B. Defendant Sikirica Is Not Entitled to Qualified Immunity

A government official is not entitled to qualified immunity if they violate "clearly established constitutional norms of which an objectively reasonable person should have been aware." *See Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998). In support of their argument that Sikirica is entitled to qualified immunity, defendants rely on a case, *Ferris v. City of Cadillac*, 272 F. Supp. 3d 1003 (W.D. M.I. 2017), which they assert allows the grant of qualified immunity where a medical examiner's conduct was at best negligent. *See* County Defs.' Mem. of Law p. 18. Defendants further argue that Sikirica's omission of the fact that CPR was administered for a prolonged period of time was legally reasonable and at most negligent, and therefore he is entitled to qualified immunity. *Id.* at 18-19.

Accepting plaintiff's allegations as true, however, Sikirica did well more than omit this one fact, and his conduct was willful and deliberate, and not merely negligent. Drawing all conclusions in plaintiff's favor, as detailed extensively above, Sikirica knowingly fabricated scientific evidence including *inter alia*, that he had ruled out *any* natural cause of death or other explanation for V.D. to have been unconscious before Davis began CPR, despite later conceding that it was possible V.D. had died of a natural event and that he could not dispute that V.D. could have been unresponsive and in cardiac arrest before Davis attempted CPR, that the amount of blood found in V.D.'s abdomen indicated that the lacerations did not occur during Davis' CPR attempt, and that V.D. was alive after the injuries because the five squeezes described by Davis would not have amounted to 400 MLs of blood, despite conceding that the additional 6,000 compressions by EMS and hospital staff, which he did not document in his autopsy report, would have contributed to the

34

amount of blood found in V.D.'s abdomen at autopsy, and that humans continue to bleed after death with CPR.

Moreover, Sikirica's initial linking of V.D.'s death to compressions by "large hands," while excluding the fact that many other sized hands—including potentially other "large hands"— had also performed CPR, and despite there being no medical basis to make this assumption, was misleading evidence which was conveyed to the RCDAO, and was key to linking V.D.'s death to Davis. Sikirica's later efforts to then distance himself from this initial determination that V.D's injuries were CPR related to support a theory that V.D.'s injuries were caused by something other than Davis' CPR attempt, as this would have been admittedly exculpatory, also creates a material question of fact as to whether Sikirica manufactured material false and misleading medical evidence in his myopic focus on Davis and in support of the wrongful prosecution of plaintiff. No reasonable official could believe that the deliberate and knowing creation of misleading and/or scientifically inaccurate reports and information was not in violation of established constitutional norms and as such, if this conduct were credited by a jury, Sikirica would not be entitled to qualified immunity. *See Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008); *Scotto*, 143 F.3d at 113. The foregoing also renders this case distinguishable from *Ferris*, the case upon which the County defendants rely, because here, a jury could conclude that that Sikirica did not "articulate [his] opinions of what the evidence means honestly and in good faith" but rather intentionally fabricated and tailored facts to support the prosecution of plaintiff. Based on the foregoing, Sikirica should not be granted qualified immunity.

### C. The City Defendants are not Entitled to Qualified Immunity

"Under federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act" (internal quotation marks omitted); *see also*, *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007). "[T]he matter of whether a defendant official's conduct was objectively reasonable, i.e., whether a reasonable official would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact.'" *Scotto*, 143 F.3d at 113. "Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual questions must be resolved by the factfinder." *Id.* (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)). Summary judgment should not be granted on qualified immunity grounds where the material facts of a claim are in dispute and those facts bear on the question of whether the defendants' conduct was objectively reasonable. *See e.g.*, *Curry v. City of Syracuse*, 316 F.3d 324, 334-35 (2d Cir. 2003); *Green v. City of New York*, 465 F.3d 65, 83 (2d. Cir. 2006); *Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir. 2002).

"Second Circuit precedent has placed the right to be free from [] malicious prosecution and the right to a fair trial 'beyond debate.'" *See Perez v. Duran*, 962 F. Supp. 2d 533, 544 (S.D.N.Y. 2013). In the context of malicious prosecution, an officer is entitled to qualified immunity "if either: (a) it was objectively reasonable for the officer to believe that probable cause existed; or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Blake v. Race*, 487 F. Supp. 2d 187, 213 (E.D.N.Y. 2007). This standard is often referred to as arguable probable cause which "exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law." *See Blake*, 487 F. Supp. 2d at 213.

First, for the reasons set forth at Points I through III, *supra*, plaintiff has set forth genuine issues of material fact as to his malicious prosecution, denial of right to fair trial, and conspiracy claims, and the facts directly bear on the question of whether defendants' conduct was reasonable, therefore summary judgment on qualified immunity grounds is inappropriate. *See e.g.*, *Curry*, 316 F.3d at 335; *Green*, 465 F.3d at 83; *Mickle*, 297 F.3d at 122; *Thagard v. Lauber*, 317 F. Supp. 3d 669, 686–87 (W.D.N.Y. 2018). Moreover, accepting plaintiff's allegations as true, none of the officers could have believed that arguable probable cause existed to prosecute plaintiff for CPR related injuries that V.D. sustained after she was already unresponsive. Therefore, none of the defendants are entitled to qualified immunity for either their direct involvement in initiating the prosecution or in the alternative for failing to intervene, insofar as a no fair jury could find "that reasonably competent police officers, faced with the information available to the non-intervening officer at the time of the arrest, could disagree about the legality of the arrest." *See Ricciuti,* 124 F.3d at 129.

Further, as to Fountain and Coonradt, because plaintiff alleges that they fabricated evidence which was likely to influence the prosecution and a jury, they are not entitled to qualified immunity. *See Bailey*, 79 F. Supp. 3d at 458 ("No defendant officer is entitled to qualified immunity when alleged fabrication of evidence is key to the case.") *See also*, *Thagard*, 317 F. Supp. 3d at 685–87; (a defendant cannot be protected by qualified immunity in the context of a denial of the right to fair trial where accepting plaintiff's version of events, the defendant fabricated evidence and a reasonable jury could so find); *Isaac v. City of New York*, No. 16 Civ. 4729 (KAM), 2018 WL 5020173, at *15 (E.D.N.Y. Aug. 6, 2018), *report and recommendation adopted*, No. 16 Civ. 4729 (KAM)(RLM), 2018 WL 4583481 (E.D.N.Y. Sept. 24, 2018); *Blake*, 487 F. Supp. 2d at 214. Similarly, *Thagard v. Lauber*, 317 F. Supp. 3d 669, 685–87 (W.D.N.Y. 2018).

## POINT VI
### PLAINTIFF'S CLAIM FOR MUNICIPAL LIABILITY SHOULD PROCEED

"A municipality may be liable under 42 U.S.C. § 1983 if a municipal 'policy or custom' causes 'deprivation of rights protected by the Constitution." *Davis-Guider v. City of Troy*, No. 17 CV 1290 (DJS), 2019 WL 1101278, at *8 (N.D.N.Y. Mar. 8, 2019) (internal quotation marks and citations omitted). "Under the failure to supervise or discipline theory, a plaintiff must show that 'the municipality failed to adequately supervise or discipline its employees (thereby implicitly encouraging or ratifying their unlawful conduct) . . . [and] that such a failure of supervision or discipline was tantamount to deliberate indifference.'" *Buari*, 530 F. Supp. 3d at 400 (quoting *Alwan v. City of New York*, 311 F. Supp. 3d 570, 578 (E.D.N.Y. 2018) (collecting cases)). "Deliberate indifference is shown when "the need for more or better supervision to protect against constitutional violations was obvious.'" *Buari,* 530 F. Supp. 3d at 400 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id. See also, Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). "[T]here is no requirement that complaints result in a formal finding of misconduct for such complaints to support findings of failure to supervise." *Buari,* 530 F. Supp. 3d at 400.

Plaintiff has offered sufficient facts to support his claim that his constitutional rights were violated by the County's failure to supervise defendant Sikirica. Through the trials of Joseph McElheny and Adrian Thomas, defendant County was aware that defendant Sikirica had on prior occasions tailored his reports, medical findings, and testimony in support of malicious prosecutions involving natural deaths of juvenile decedents. PSC ¶¶ 109-111. The County was

also aware that this had contributed to constitutional violations, yet the County did nothing to investigate or discipline Sikirica; instead, the County continued to employ Sikirica and pay Sikirica large sums of money, including providing him a raise in 2019.  PCS ¶ 112-114.  Additionally, the County was also aware or should have been aware that during his ongoing employment with the County, that Sikirica was overworked and conducting nearly double the amount of autopsies recommended by the National Board of Medical Examiners per year.  PCS ¶ 108.  The County's failure to act, as demonstrated by its continued employment of Sikirica, despite the warning signs that Sikirica was overworked, not careful in his work, was improperly handling the autopsies of juvenile deaths, and inadequately investigating the prior medical history of juvenile decedents resulting in failed prosecutions, and had on other occasions similarly offered faulty diagnoses and cause of death determinations, which ignored obvious medical evidence of natural causes for infant and child deaths, ratified his behavior and led to the civil rights violations suffered by Davis.  The foregoing is sufficient to create a material question of fact such that plaintiff's *Monell* claim as to defendant County should be permitted to proceed to trial.

<u>**POINT VII**</u>
**PUNITIVE DAMAGES**

Both the City and County defendants argue plaintiff should not be permitted to recover punitive damages.  *See* City Defs.' Mem. of Law, p. 24; County Defs.' Mem. of Law p. 23. "Punitive damages are available in a § 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Lin v. County of Monroe*, 66 F.Supp.3d 341, 362 (W.D.N.Y. 2014) (internal quotations omitted); *see also*, *Lozada v. Weilminster*, 92 F.Supp.3d 76, 108 (E.D.N.Y. 2015) (collecting cases).  "Generally, the issue of whether defendants' conduct is sufficiently serious to warrant punitive damages is a question best left to the jury." *Lozada*, 92

F.Supp.3d at 108, *Lin*, 66 F.Supp.3d at 362; *Harrison v. Ford Motor Co.*, No. 11 Civ. 0840 (MAD) (DEP), 2013 WL 3098695, at *13 (N.D.N.Y. June 18, 2013); *Kramer v. Showa Denko K.K.*, 929 F.Supp. 733, 742 (S.D.N.Y. 1996).  Here, if a jury were to credit that the defendants' fabricated and misleading testimony resulted in plaintiff being maliciously prosecuted and denied his right to fair trial, such conduct could be considered sufficiently callous and reprehensible to entitle plaintiff to an award of punitive damages.  *Haskins v. Jackson*, No. 15 Civ. 2016 (MKB), 2020 WL 6705640, at *18 (E.D.N.Y. Nov. 10, 2020) (recognizing that the "jury's objective findings indicating that Defendant lied about the circumstances of Plaintiff's arrest . . . and also lied when he testified at trial sufficiently establish the reprehensibility of Defendant's conduct"); *Harewood v. Braithwaite*, 64 F. Supp. 3d 384, 405 (E.D.N.Y. 2014) (holding that a finding that an officer "recklessly disregarded or was indifferent to the evidence demonstrating, or tending to demonstrate, that [the officer] did not have probable cause to arrest supported an award of punitive damages).  Based on the foregoing, whether plaintiff is entitled to punitive damages is a question best left for a jury.

## CONCLUSION

For the reasons set forth above, defendants' motions should be denied, together with such other relief to plaintiff that the Court deems just and proper.

Dated:   New York, New York
         April 1, 2022

                                       BRETT H. KLEIN, ESQ., PLLC
                                       Attorneys for Plaintiff
                                       305 Broadway, Suite 600
                                       New York, New York 10007
                                       (212) 335-0132

                                     By: *Brett Klein*
                                           BRETT H. KLEIN
                                           LISSA GREEN-STARK