UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MICHAEL DAVIS-GUIDER,

                              Plaintiff,

                    -v-    17-cv-1290

CITY OF TROY, et al.,

                              Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE DANIEL J. STEWART
                    December 5, 2022
                445 Broadway, Albany, New York


FOR THE PLAINTIFF:

BRETT H. KLEIN, ESQ.
305 Broadway, Suite 600
New York, New York 10007


FOR DEFENDANT RENSSELAER COUNTY:

BAILEY, JOHNSON & PECK, P.C.
By:  William C. Firth, Esq.
5 Pine West Plaza, Suite 507
Albany, New York 12205


FOR DEFENDANT CITY OF TROY:

PATTISON SAMPSON GINSBERG & GRIFFIN PLLC.
BY:  Michael Ginsberg, Esq.
     Rhiannon Gifford, Esq.
P.O. Box 208
Troy, New York 12180

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1          COURT CLERK:  We are back on the record.  The

2     case is Michael Davis-Guider versus City of Troy and

3     others, case number 17-cv-1290.

4               Please state your appearances for the record.

5               MR. KLEIN:  Brett Klein, for the plaintiff.

6     Good afternoon, Judge.

7               THE COURT:  Good afternoon.

8               MR. FIRTH:  Your Honor, William Firth, on

9     behalf of Dr. Sikirica and Rensselaer County.

10              THE COURT:  Good afternoon to you.

11              MS. GIFFORD:  Your Honor, Rhiannon Gifford

12    from Pattison, Sampson, Ginsberg & Griffin, on behalf of

13    the City of Troy, Ronald Fountain, Danielle Coonradt,

14    Charles McDonald, and Tim Colaneri.

15              THE COURT:  Good afternoon.

16              MR. GINSBERG:  Mike Ginsberg of Pattison,

17    Sampson, Ginsberg and Griffin, for the same defendants,

18    your Honor.

19              THE COURT:  All right.  Thank you.  So we have

20    presently pending in this case a motion for summary

21    judgment on the issue of liability and on the issue of

22    qualified immunity.

23              Rhiannon, why don't I have you summarize the

24    position of the City defendants.

25              MS. GIFFORD:  Yes, your Honor.  Thank you.


                   Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1            The City defendants' position, as detailed in

2     our brief, is that there's no genuine issue of material

3     fact in this matter.  There was an indictment to proceed

4     with the prosecution against Mr. Davis-Guider.  This

5     matter does not involve any sort of confession or nature

6     that is similar to Thomas.

7            The issue here is that the plaintiff

8     essentially seems to dispute about four statements that

9     were made at the grand jury presentation to support his

10    theory that there was perjury or police misconduct to

11    overcome the probable cause created by the indictment.

12           We submit that those four statements that he

13    relies upon are, one, not false.  There's no evidence to

14    indicate that they were false or made with the intent to

15    deceive or lie; they're in response to the material

16    facts statement that was submitted by the plaintiff.  We

17    detailed extensively additional evidence that supports

18    why Detective Fountain made those statements to the

19    grand jury and to prove that they are not false.

20           There's no indication or evidence submitted by

21    the plaintiff to create a question of fact as to any

22    police misconduct or inappropriate behavior that caused

23    the prosecution to proceed or the arrest from the grand

24    jury indictment to be improper.

25           For -- I think for this, it's a little

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    difficult because there are four different police

2    officers that are charged with -- or accused of

3    misconduct by the plaintiff but they kind of had

4    different roles and need to be analyzed individually.

5    For example, Danielle Coonradt, she was the responding

6    officer on the scene.  She obtained a single statement

7    of essentially an excited utterance from the plaintiff

8    when she arrived on scene and asked what happened.

9           At that point in time, Officer Coonradt had no

10   idea that the child would be declared deceased at any

11   point.  She had no idea that a crime had actually even

12   occurred.  She was just arriving in response to the 911

13   call made by Mr. Davis-Guider.  He -- the plaintiff

14   repeatedly claims that she falsified the statement that

15   he made guessing or saying that it was 11:00 when he had

16   woken up.

17          I submit that that's not only not false,

18   there's evidence she has maintained and consistently

19   testified to that statement, was in her police reports,

20   but it's not relevant.  It's not relevant because when

21   Detective Fountain was presenting to the grand jury, he

22   even said and conceded the plaintiff said maybe he woke

23   up maybe 11 or 12 but he wasn't really sure.  There were

24   no clocks, there were no phones available for him to be

25   precise about it.

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1          Simply recording a statement that was made and

2     putting it in the record as she received it cannot

3     overcome or serve as evidence that she knowingly and

4     intentionally falsified a statement.  There's just no

5     evidence to support that contention.  Ms. Parker even

6     said herself that Mr. Davis-Guider had alluded to or

7     potentially even being 11:00 wake-up, but he wasn't

8     certain.

9          The theme there was he didn't know exactly

10    what time it was.  But Miss -- Police Officer Coonradt

11    was doing her job when she arrived on the scene to take

12    down the statement.  She has really no involvement, is

13    entitled to summary judgment on all of the claims

14    against her on those grounds.

15          And turning to Charles McDonald and Tim

16    Colaneri, they are kind of in a similar boat where

17    there's really no allegations of impropriety made

18    against them.  There's no threats.  There's no coercion.

19    They didn't really do anything.  They testified before

20    the grand jury.  I believe McDonald maybe testified at

21    one pretrial hearing but didn't testify at trial.  Those

22    two officers really had no involvement in the

23    prosecution at all and were not involved in any sort of

24    improper police conduct in furtherance of obtaining the

25    grand jury indictment that created the probable cause.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1        THE COURT:  Okay.

2        MS. GIFFORD:  Detective Fountain was the only

3   individual who testified at the grand jury, and as

4   stated, plaintiff's claims really center around the four

5   misstatements that he asserts were made by Fountain;

6   however, the plaintiff's arguments are his own

7   conjecture in response to what Fountain testified to at

8   the grand jury.

9        Case law in this Circuit mandates that a plus

10  factor be presented.  Some sort of corroborating

11  evidence outside of the grand jury testimony to support

12  his claim that Fountain lied or that it was a competing

13  version of events.

14       Competing versions of events are not evidence

15  in and of itself of lying or improper misconduct before

16  the grand jury, and this is important in the context of

17  noticing that Fountain is entitled to ultimate, I mean

18  absolute immunity for his grand jury testimony.

19       The plaintiff did not make any claims or

20  accusations about police misconduct by Fountain outside

21  of anything that was said during the grand jury

22  testimony, and as the case law cited in our briefs,

23  *Rehberg* and *Bonds versus City of New York* makes clear

24  the Court can't over -- the plaintiff must come forth

25  with that plus factor to try to take the testimony from

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    the grand jury outside of the absolute immunity grounds

2    that he's entitled to.

3                 THE COURT:  Okay.

4                 MS. GIFFORD:  And if -- unless the Court has

5    any other questions, I believe we will rely on the

6    briefs for the arguments.

7                 THE COURT:  No, I understand your argument.

8                 Mr. Firth.

9                 MR. FIRTH:  Thank you, your Honor.  As

10   Rhiannon pointed out and the Court is well aware, we're

11   dealing with another case that has a presumption of

12   probable cause by virtue of the grand jury indictment.

13                Plaintiff was required again to come forward

14   with evidence of -- on the part of Dr. Sikirica in terms

15   of suppressing evidence, committing perjury --

16                THE COURT:  What was the basis for

17   Dr. Sikirica testifying that the fractured ribs were

18   caused by someone with large hands?

19                MR. FIRTH:  I believe that it was reported to

20   him, your Honor, that that's what had occurred.

21                THE COURT:  Who reported that to him?

22                MR. FIRTH:  As I stand here now, Judge, I'm

23   not sure.  I'm not sure if it's in our statement of

24   facts or in our papers.  I'm not certain where that

25   information came from.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1          THE COURT:  I understand you're standing in
2     for Crystal.
3          MR. FIRTH:  Yeah.  That was my case.  I
4     probably should just go home, you know.  But that
5     doesn't correlate the -- that doesn't correlate with
6     Mr. Davis to -- in terms of these injuries.  It was
7     reported to him as a matter of fact.  It didn't
8     influence his cause of death determination or manner of
9     death determination.
10         THE COURT:  Well, it influenced who the grand
11    jury is going to indict.  If he says it was caused with
12    someone with large hands and the testimony was that
13    Mr. Davis-Guider had large hands, you know, I'm not sure
14    where it came from.  I'm not sure what the -- what
15    the medical basis for that is.
16         MR. FIRTH:  Well, Judge, nobody else --
17         THE COURT:  If somebody has a purple hand that
18    caused this and there was only one person who has a
19    purple hand, you know -- I'm just trying to figure out.
20         MR. FIRTH:  I'm sorry I can't answer that.
21    But the fact remains that he was the only one home alone
22    with V.D. at the time.  And even if he did indicate that
23    in his report --
24         THE COURT:  What about the other people who
25    did the -- the CPR chest compressions on the child?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1            MR. FIRTH:  Sure.

2            THE COURT:  I mean, how do -- what's the

3    evidence that it was -- it was caused by something that

4    he did as opposed to them?

5            MR. FIRTH:  He didn't say that it was caused

6    by Mr. Davis at all.

7            THE COURT:  How do they know that someone with

8    large hands was the one who caused the fracture of the

9    ribs and the severing of the liver?

10           MR. FIRTH:  How did he know that it was

11   Mr. Davis?

12           THE COURT:  How does he know someone with

13   large hands?

14           MR. FIRTH:  I don't think that he does know

15   that it was someone with large hands.  I think he just

16   talks about it anecdotally -- anecdotally in his report,

17   and for purposes of Dr. Sikirica, I'm not sure it

18   matters, Judge, because how would that amount to a

19   constitutional violation?  It's just something that he

20   put in his report.  You know, the inclusion of that is

21   not what fueled this prosecution against Mr. Davis.  He

22   was the only one with V.D. at the time.

23           And plaintiff also takes issue with the fact

24   that he did not mention in his autopsy report the number

25   of compressions that were applied.  He does certainly

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    indicate that there was a history of -- of CPR, and he

2    testified before the grand jury that these were not

3    CPR-related injuries.  He could not have been more

4    clear, and he even testified to the fact that this was

5    something -- these injuries are something that you'd

6    expect to see only in the case of a car accident but no

7    other accident would result in these types of injuries.

8            THE COURT:  Okay.

9            MR. FIRTH:  You know, and also along these

10   same lines, Judge, the prosecution was aware of the

11   number of compressions, defense team was aware of the

12   number of compressions, and it was -- it was ferreted

13   out at the trial and at the grand jury testimony again

14   that these were not CPR-related injuries.  They were

15   caused by blunt-force trauma.

16            And again, Mr. Davis was the only one who was --

17   only one who there was.  There's been no indication that

18   anybody else was there.  And in the absence of any

19   evidence contrary to having, you know, an accident be

20   the basis of this, they move forward the prosecution.

21   This was Dr. Sikirica's medical judgment, again, in his

22   experience in conducting over 10,000 autopsies, that

23   these were severe injuries.  The injury to the liver

24   just could not have happened from CPR.

25            Did he get it wrong?  Probably not, Judge.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1   But, you know, at most, that would be negligent.

2   Certainly not amount to fraud or suppression of

3   evidence -- of evidence required to overcome the

4   presumption of probable cause in this case.

5          And, your Honor, I could continue.  Let me

6   just touch base briefly on the conspiracy claim.  The

7   plaintiff refers -- Brett, very respectfully, rather

8   uniquely, your Honor, he does not have much to work with

9   here to, quote-unquote, at least a tacit agreement with

10  Troy P.D. and prosecutors to label this as a homicide.

11  There's just no evidence of that.  There's a lot of

12  speculation, circumstantial evidence at most.

13         And the *Monell* claim against the county relies

14  on two cases, *McElheny* and *Thomas*.  Certainly the *Thomas*

15  case does not put the county on notice that Dr. Sikirica

16  would require additional supervision and the *McElheny*

17  case relies on the inadmissible news article, nothing

18  more, and those talk about dueling medical witnesses,

19  which is at the very heart.  Medical judgments, medical

20  opinion, not -- not a constitutional tort.

21         Unless Your Honor has any specific questions,

22  I will rely on my brief for the remainder.

23         THE COURT:  No, I think I'll hear from

24  Mr. Klein at this point in time.

25         MR. FIRTH:  Thank you, your Honor.


                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1          MR. KLEIN:  Thank you, Judge.  Your Honor,
2    Michael Davis was arrested and prosecuted in a case
3    where there was, again, in the light most favorable to
4    Mr. Davis, similar to a case earlier today, the Thomas
5    case, no crime.
6          Mr. Davis testified consistently, stated to
7    police consistently on the day of the death of V.D. what
8    happened, that she was not feeling well for a couple of
9    days, that she awoke -- she was sick that morning, I
10   think diarrhea, went back to sleep and was then
11   unresponsive.  He tried calling 911, but didn't have a
12   phone that worked in the house.  Tried to do some chest
13   compressions himself, maybe four or five at most and
14   then went and made a call and then he -- police and his
15   girlfriend, the mother the child, all came back.
16          What happened here was not a crime.
17   Plaintiff's expert also -- the -- the same expert as in
18   Thomas, the deputy county medical center from Erie
19   County had -- will testify to the jury that to a
20   reasonable degree of medical certainty this was a sudden
21   unexplained death, phenomenon occurs, that the blood
22   present in the liver was not consistent with -- with the
23   child bleeding out from that before CPR was attempted,
24   and on and on as set forth in our papers.
25          THE COURT:  So why isn't, as Mr. Firth said,

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1  why isn't that competing medical testimony rather

2  than -- is your doctor saying that Dr. Sikirica

3  falsified an autopsy?

4         MR. KLEIN:  Right.  So -- so this -- similar

5  to the pattern that we have seen, Judge, *Davis* and

6  *McElheny*, this is a case where we go through this

7  extensively in our papers, without any link of this

8  death whatsoever to Mr. Davis other than that he's

9  present when she's found unresponsive, no other

10  reason -- no reason to think which is not probable cause

11  to arrest.  It's -- it's mere presence at the scene

12  of -- in this case, as in Davis and other cases, where

13  there's a natural causes death in the light most

14  favorable to the plaintiff.

15         And Dr. Sikirica, within hours of meeting with

16  the police, getting their statement of their interview

17  with him where he describes his three or four or five

18  CPR attempts with his large hands, says on the death

19  certificate this is a homicide.

20         And that starts a chain of events that is

21  foreseeable that Mr. Davis and Dr. Sikirica acknowledges

22  that by calling this a homicide, that this set of chain

23  of events that would likely result in grand jury action

24  and a murder charge, and he would not -- and

25  Dr. Sikirica concedes that this is bias cascade that we

1    have seen in other cases, started with the information

2    given to him by police.

3            So it's not that we're saying per se it's

4    improper for the medical examiner to get information for

5    their forensic review of a death to evaluate all the

6    factors.  It's certainly -- we have cited the medical

7    examiner standards.  It's not recommended but -- but

8    beyond that, what's -- the issue in this case is

9    different.

10           Is it -- is there an inference that a

11   reasonable jury could credit that Dr. Sikirica was given

12   this story from the police, their suspicions of a

13   homicide, and he basically crafted his determination

14   without regard for natural causes.

15           THE COURT:  What proof do you have of that?

16   He's obviously denied it.  I mean, Second Circuit is

17   pretty clear about conspiracies, that there's got to be

18   some proof with regard to it.

19           MR. KLEIN:  We do have -- we do lay out,

20   Judge, in our -- in our papers, I believe, that there

21   were labs or swabs done to determine if there were

22   natural causes potentially contributing just like in the

23   Thomas case, where there were -- there was evidence

24   of streptococcus pneumonia that came back.  I believe

25   similarly here there were tests that were done or could

1    have been done but Dr. Sikirica deemed this a homicide

2    after speaking with the police.  There's no -- even if

3    that's the case, there's no reason to think Michael

4    Davis committed a homicide, and as the defendants

5    maintain, there's no suggestion here that CPR resulted

6    in her -- in V.D.'s death.

7            So the suggestion here is that there's some

8    period of time although these goalposts seem to have

9    change and that's the essence of the claim here of this

10   fabricated false testimony, not that the child died but

11   that Michael Davis was responsible for this blunt-force

12   trauma and a homicide when there was no evidence of it.

13           The only evidence that Dr. Sikirica knew in

14   rendering his autopsy was what the police -- to answer

15   your question before -- what they showed him and told

16   him based on their interview with Michael Davis, which

17   they acknowledge, did not give them probable cause to

18   arrest.

19           THE COURT:  All right.

20           MR. KLEIN:  It's only when Dr. Sikirica takes

21   that information and links it to this large hand that

22   they then, you know, prosecuted Mr. Davis based on this

23   bias cascade.  So this information --

24           THE COURT:  All right.  So with regard to --

25   I'm just trying to break this down.  Okay?  Dr. Sikirica

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    does the autopsy, comes to a conclusion.  Your doctor

2    reviews the medical records, comes to a different

3    conclusion, correct?  Is it fair to say that reasonable

4    medical professionals can disagree?

5              MR. KLEIN:  Not in our view.  Not in the view

6    of our expert that --

7              THE COURT:  Is your expert testifying that the

8    conclusions that Dr. Sikirica -- were false, fraudulent

9    or amounted to malpractice?

10             MR. KLEIN:  Yeah, that's the essence of her

11   testimony.  That his -- his -- his -- his medical --

12   just as in the Thomas case, this was a -- without

13   question in her mind to a reasonable degree of

14   professional certainty a case of natural cause of death,

15   and she absolutely disagrees that there's any other way

16   to look at this.

17             THE COURT:  But in Thomas, we have the five

18   other doctors who have a different view with regard to

19   that.

20             MR. KLEIN:  Well, there were different -- it's

21   very nuance, Judge.  There's views about the fluid

22   collection in the brain, about a hematoma, and there's

23   views about the -- the spreading of the fontanels in the

24   brain and the -- I believe it's called the -- the

25   sutures of the brain, the brain -- of the skull

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    swelling, whether that could be consistent with trauma.

2          It doesn't necessarily mean there was a trauma

3    consistent with abuse.  There's trauma that results from

4    medical staff touching the child from postmortem

5    contact, from blood filling up in the brain due to an

6    overwhelming septic infection in that case resulting in

7    meningitis.  In this case, there's no evidence -- just

8    like in that case, there's no evidence of any physical

9    struggle.  There's no bruising.  There's no evidence --

10   sign of any trauma whatsoever.

11          But what we have is this being classified as a

12   homicide after a meeting with the police, further

13   meetings with the police after they don't -- they

14   concede they don't have enough to rope Mr. Davis in in

15   this case, and then -- and efforts by the police to get

16   Mr. Davis to give them more.  To confess.  They take him

17   in the same room that they had Mr. Thomas in.

18          And then the officers conveying to prosecutors

19   a story that is disputed, and I think that's really the

20   thing here, as in the Davis case.  The police will say

21   we have this information written down that the plaintiff

22   said this or that, and so they just merely pass that on.

23   But the -- but that misses a crucial issue at this stage

24   of the proceedings, Judge.

25          Plaintiff denies this information was ever

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    said about the timing and such.  But it created and it

2    was material enough to be presented.  It was influential

3    enough to prosecutors that it resulted in the testimony

4    being given based on statements made to prosecutors

5    which gets outside of *Rehberg* that shows that

6    Mr. Davis didn't have -- didn't have a credible story,

7    and this was false and this was disputed and he was

8    found innocent at trial.

9            So, when you take the conduct together,

10   this initial determination of a homicide after speaking

11   with the officers about their feelings about this,

12   having no reason to think that Mr. Davis was anything

13   but merely present when a child who was sick woke up

14   unresponsive, completely disregarding the evidence of

15   natural causes, of a natural cause of death, later

16   conceding that if she died in extreme -- due to CPR from

17   EMTs or Mr. Davis, that wouldn't be a homicide but

18   maintaining that something happened here, resulting in

19   this severe trauma and sticking to their story.

20           I think a jury could find that that is

21   manufactured evidence in an effort to come up with a

22   story that's consistent with the police theory of what

23   happened here.  It's --

24           THE COURT:  A lot of speculation.

25           MR. KLEIN:  I don't think so, Judge.


Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1          THE COURT:  Let me ask you this, then.  Were

2     there any -- what meetings were there between what

3     detectives and what police officers and Dr. Sikirica

4     where they suggested to him that they make a certain

5     finding?  Do we have any evidence of that?

6          MR. KLEIN:  In terms of suggesting the -- only

7     they were at the meetings and they discussed the --

8          THE COURT:  How many meetings were there?

9          MR. KLEIN:  There were at least -- there was

10     one I believe a day after the -- the child was found

11     dead, another one after Mr. Davis was interviewed within

12     a couple of weeks after that, and then another one again

13     in mid March and then there were meetings with

14     prosecutors several months later when the autopsy was

15     created.

16          And this autopsy, again, I think, again,

17     credibility issues was -- was drafted by someone who's

18     working for many counties in Upstate New York, not just

19     Rensselaer, conducting several hundred autopsies a year,

20     testifies that each one takes days to do.  And so based

21     on that, those numbers, it would seem impossible for him

22     to have been doing less than a few per day, and then he

23     does a report months and months and months later.

24          And they paint this picture of -- of -- after

25     these -- tying Mr. Davis to this crime, A, when -- and

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    Mr. Davis is -- in a light most favorable to Mr. Davis,

2    there's no credible medical evidence of any crime.  Even

3    the officers found, I believe, gave a statement that it

4    was his understanding when they made one last effort to

5    talk to Mr. Davis in an interrogation room after the

6    autopsy was finally issued months later that it was his

7    understanding from speaking with Dr. Sikirica that

8    Mr. Davis squeezed the child during CPR effort and broke

9    the rib and caused the rib to lacerate the liver.

10             I don't think there's any question, the rib

11   didn't lacerate the liver and that these injuries,

12   again, per Mr. Davis' experts and I believe per

13   Dr. Sikirica wouldn't have caused the death.  So, there

14   was this effort to get their man and to do what they had

15   to do to get someone to get Mr. Davis responsible for

16   this crime and it failed in this case and the Thomas

17   case it succeeded until it failed.

18             But this is really a striking pattern.  It's

19   not a coincidence and, you know, we have a credible

20   evidence of natural cause of death and no trauma in both

21   cases and -- and extreme efforts to prosecute someone

22   when there was no reason to believe that this person

23   committed any crime.

24             THE COURT:  All right.

25             MR. KLEIN:  They say that he was calm, not

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1     acting like someone who just lost a child that he loved.

2     He said he was distraught and crying.  They say that he

3     wasn't clear about the timing.  He said he never said

4     that and they paint this image of --

5                 THE COURT:  Those are factual issues in every

6     criminal case I have ever had.

7                 MR. KLEIN:  Right, but they disputed factual

8     issues.  So for the defense to say here, as they did in

9     our other case today, Thomas, well, they wrote down

10    contemporaneously this or that so there's no evidence of

11    the contrary, there is.  Just want to state for the

12    record these are disputed facts and they all together

13    led to this malicious prosecution in violation of due

14    process.

15                THE COURT:  Okay.  Thank you.

16                MR. KLEIN:  Thank you, Judge.

17                THE COURT:  All right.  Anything further from

18    the defense counsel?

19                Mr. Firth, anything further?

20                MR. FIRTH:  Your Honor, all the points made by

21    Brett are addressed in our brief.

22                THE COURT:  Okay.  Anything further from the

23    state defendants?

24                MS. GIFFORD:  I just wanted to briefly address

25    the point about the conflicting statements in

1    Mr. Klein's final point that they are disputed based

2    upon Mr. Davis-Guider.

3              The plaintiff's mere conjecture and

4    speculation surmise isn't enough to create the question

5    of fact, and as my response to his material statements

6    makes clear, there's significant corroborating evidence

7    outside of what the police said was the version of

8    events that they recall.

9              As a -- stated, we have statements from Miss

10   Parker who corroborated the timing issue in her written

11   statement to the police.  There's pictures of the bed.

12   There's the EMTs' own statements, which almost all of

13   them agree that Mr. Davis-Guider appeared pretty calm,

14   subdued.  All of that evidence is before the Court.

15   It's not simply just two versions of events from the

16   plaintiff and the defendant.

17             There's significant other corroborating

18   evidence that hasn't been addressed or discussed by the

19   plaintiff or said to have been included in this scheme

20   to frame his client.  I just wanted to address that kind

21   of misstatement in my thought.

22             THE COURT:  Thank you.  Thank you both.  Thank

23   you both -- all three of you -- four of you.  So I

24   appreciate the substance of this oral argument.  We will

25   go ahead and issue a decision on both cases in due

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    course.

2          Is there anything further on behalf of the

3    plaintiff you want me to address while we're here?

4          MR. KLEIN:  Just one second, Judge.  I will

5    look at my notes.  No, Judge, I think that's all for us.

6    Thank you so much.

7          THE COURT:  All right.  On behalf of the

8    county?  Dr. Sikirica?  Anything further?

9          MR. FIRTH:  No, your Honor.

10         THE COURT:  On behalf of the city, anything

11   further?

12         MS. GIFFORD:  No.  Thank you, your Honor.

13         THE COURT:  All right.  Thanks, everybody.

14         (Proceeding concluded.)

15               * * * * * * * * *

16

17

18

19

20

21

22

23

24

25

                Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

C E R T I F I C A T I O N

    I, Lisa L. Tennyson, RMR, CSR, CRR, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of New York, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

                     /s/ Lisa L. Tennyson

                    Lisa L. Tennyson, RMR, RPR, FCRR

                Lisa L. Tennyson, CSR, RMR, FCRR
             UNITED STATES DISTRICT COURT - NDNY